ROBERTSON, J.,
delivered the opinion of the court:
The returns having been made without .reference to the recent act of Congress suspending the privilege of the writ of habeas corpus in certain cases, and the respondent not asking leave to amend them and rely upon -that act; but on the contrary stating that he asserts no right under it to hold the petitioners in custody; the court does not consider it necessary to decide any question which might arise under said act, and will proceed to consider these cases irrespective of it.
Although this court has, more than once, acted upon questions arising under the acts of Congress approved on the 16th day of April 1862, and on the 27th day of September 1862, commonly called the conscription acts, it has never until now been called on to decide upon their constitutional validity, that having been heretofore either expressly or tacitly conceded. But the question, whether Congress had the power, under the constitution, to pass said acts, is now raised: and, as it is of the highest public importance, it is proper that it should receive the most careful and deliberate examination. In deciding it, considerations of expediency and policy cannot be permitted to control our judgment. We must expound the constitution according to what appears to be its true meaning; and if it be clear that no power to pass the acts in question has been conferred by it, we are bound to declare them void and of no effect, however disastrous may be the consequences of our decision.
*It is said that Congress cannot, under the grant of the power to raise armies, place, by force, and at their own discretion, the citizens of a state in the ranks of the army of the Confederate States. That a power so to do, would be despotic in its nature, and far greater and more dangerous than any possessed by the government; subjecting as it does the personal freedom of every citizen to arbitrary discretion : and moreover that it would be inconsistent with the rights of the state; putting their very existence at the mercy of the Confederate government. That a mere general grant of the power to raise armies, without specifying the mode in which they are to be raised, cannot be held to confer an authority so repugnant to the spirit of free institutions, the principles on which our constitution rests, and the rights secured by it.
The power of coercing the citizen to render military service, is indeed a transcendent power, in the hands of any government; but so far from being inconsistent with liberty, it is essential to its preservation. A nation cannot foresee the dangers to which it may be exposed: it must therefore grant to its government a power equal to every possible emergency; and this can only be done by giving to it the control of its whole military strength. The danger that the power may be abused, cannot render it proper to withhold it; for it is necessary to the national life. The hazard of abuse should be guarded against by so framing the- government as to render it unlikely that it will ever use the power oppressively.
The real question for our consideration, then, is not whether the power exists, but where it exists. Has it been conferred on the Confederate government, or is it retained by the states? In its effects upon the individual personally, the act of compelling him to render the service is the same whether it is performed 'by the state, or by the Confederate government. The question *as to .which of them should exercise the authority relates merely to the proper distribution of political power between the two governments. And the idea that first suggests itself is that it ought to be placed in the hands of the one which is charged with the duty of providing for the defence of the country; for a government “from whose agency the attainment of any end is expected, ought to possess the means by which it is to be attained.”
The clauses of the Confederate constitution relating to the military power, and its exercise, have been adopted without change from the constitution of the United States, the amendments to the latter being inserted in the body of the former. Whatever therefore throws light upon the meaning of the constitution of the United States, on this point, throws equal light upon the meaning of ours.
It is well known that the union of the colonies was formed for the purpose of combined resistance to the oppression of the mother country. Delegates from the several colonies, constituted a Congress which assumed the conduct of the war, in the name and on behalf of all the colonies, which soon became the United States of America. But the Congress could exercise the power of compelling citizens to serve in the army only through the intervention of the states, by means of requisitions upon them for their respective quotas of men; and, being *181 unable to enforce compliance with these requisitions, it was found impossible to raise an army sufficient for the vigorous prosecution of the war. This difficulty, which had been so painfully felt throughout the contest, and which, indeed, put to serious hazard the success of the cause, was one of the chief reasons urged in favor of the change of the form of government effected by the adoption of the constitution of the United States. It was insisted that the government having the power of determining on peace and war, and ^charged with the duty of providing for the common defence, should be invested with power commensurate with that end, and that this could only be done by abandoning the system of requisitions upon the States, and authorizing the Federal government to act directly upon individuals. These views prevailed, the constitution being framed in accordance with them.
It will be observed that a broad distinction is made in the constitution, between the “militia,” and the “armies,” referred to in it: the powers conferred upon Congress, and denied to the states, in reference to the one, being widely different from the powers con-' ferred and denied in reference to the other. And, indeed, the two words could not properly have been used to convey the same idea. An army is a body of men whose business is war: the militia a body of men composed of citizens occupied ordinarily in the pursuits of civil life, but organized for discipline and drill, and called into the field for temporary military service when the exigencies of the country require it.
The experience acquired during the revolutionary war had demonstrated, what indeed all previous experience had taught, that however valuable a militia may be, it is unable to contend permanently and successfully with veteran troops; and that it would be to the last degree unsafe to trust to it exclusively for the defence of the country. It was well known that a regular army would be absolutely indispensable in a protracted contest with a powerful nation. Accordingly, in spite of the jealousy, inherited from their English ancestors, against standing armies, the framers of the constitution gave to Congress the power “to raise and support armies.” There is certainly nothing in the terms of the grant to restrict Congress to voluntary enlistments as a means of raising armies. Nor does any sufficient reason appear why such restriction should have been imposed. The experience *of the revolution had shown that it was necessary to resort to compulsion to fill the ranks of the army. This compulsion had not, it is true, been applied by the Federal government; but that was because it had no power to resort to it, being confined to requisitions upon the states. The states had the pow'er: and, in compliance with the requisitions made upon them by Congress, continually exercised it, not for the purpose of bringing out the militia merely, but for the purpose also of filling the ranks of the regular army when voluntary enlistments fell short of the number ‘to be furnished for it. See Marshall’s Life of Washington, vol. 4. p. 241.
Instances of such legislation are to be found on the statute book of the State. In May 1777, an act was passed “For the more speedily completing the quota of troops to be raised in this commonwealth for the continental army, and for other purposes:” in which it was provided that if, before the 10th day of August 1777, a sufficient number of men should' not'have enlisted to make up the quota required, the deficiency should be made up by draughts from the militia; and that each man, so draughted, should “be to all intents and purposes, considered as a regular soldier;” and should serve as such, for three years, if the war should so long continue. See 9 Hen. Stat. at large, p. 275. See also the same volume of Hen. p. 337, and vol. 10 Id. pages 82, 214, 259, 333; and vol. 11 Id. p. 14, for instances of similar legislation. Other instances might doubtless be pointed out; but these are amply sufficient to put it beyond controversy that compulsory draughting was an ordinary means used for filling the ranks of the regular continental army. This, of course, was well known to the framers of the constitution of the United States. If it had been their design to restrict Congress to voluntary enlistments as the means of raising armies, is it at all probable that they would have failed so to declare "x"in express terms? In granting the power “to raise armies,” without any words of limitation or restriction as to the mode to be employed, they must be understood ‘as intending that the power should be exercised in any and all of the modes w’hich had been previously employed by the States. Full power to make war was vested in the Federal government. Of course it could not have been intended, if an offensive war, necessary for the assertion of the rights or vindication of the honor of the countrjq should be undertaken, to withhold from the government the means of prosecuting it with success, by denying to it the use of any troops, except such as might be obtained by voluntary enlistment. Yet this was done, if the power to use compulsion to fill the ranks of the army was not conferred on Congress; for the militia can be called out only for the purpose of executing the laws, suppressing insurrections, or repelling invasions.
But it is said that it does not appear that any objection was made, at the time of the adoption of the constitution of the United States, to the clause granting the power to raise armies, on the ground that it gave to Congress the power of conscription; and that it is incredible that a power so vast and dangerous would have passed without objection, if it had been then supposed to be possible that it would ever be claimed by anjT one that such power was conferred. It will hereafter be shown that the failure to make the objection may be accounted for on other grounds than the one suggested; *182 but however this may be, it is entitled to not the slightest weight in determining the construction of the constitution of the Confederate States. When that constitution was adopted, it was well known that the power in question had been asserted to exist, under the constitution of the United States, by many statesmen whose opinions *had always been received ■ with the utmost respect, especially in the southern states of the late union.
In October 1814, Mr. Monroe, who was then Secretary of War under the administration of Mr. Madison, addressed a letter to Mr. Troup of Georgia, as chairman of the military committee of the house of representatives, in which he proposed four different plans for organizing the forces of the United States. The first of these plans, and „the' one for which he expressed his preference, proposed that the army should be raised by draught from the free male population of the United States, between 18 and 45 years of age; and he entered into a full examination of the question as to the constitutional right of Congress to compel citizens to serve in the army; coming to the conclusion that there was no doubt of the existence of such right. Mr. Troup, as chairman of the committee on military affairs, reported a bill in conformity with the first plan recommended by Mr. Monroe; but it was never acted upon; a bill upon a different plan having been passed by the senate and sent to the house, where it was amended in certain particulars, in reference to which no agreement was had. between the house and senate, when the treaty of peace with Great Britain rendered the passage of any bill unnecessary, and the 'whole subject was dropped. But the proposition of Mr. Monroe to raise men by conscription (as it was then designated) led to much discussion, in which the right was earnestly asserted by some, and as earnestly denied by others; those asserting it belonging generally to the states rights party. See Annals of Congress (13 Cong. 1814-15, vol. 3).
This is not referred to as settling conclusively the true construction of the constitution in this particular; but it shows that the framers of the constitution of the Confederate States did not agree in opinion with those who think that the power in question is fraught with *danger to the liberties of the citizen or the rights of the states, or they would have taken care to use language which would leave no doubt that they did not intend to confer it, instead of retaining that which had been construed, by many of the wisest statesmen under the government of the United States, to give it.
But it is impossible that it could have beeii supposed, at the time of the adoption of the constitution of the United States, that it would never be claimed by any one that it conferred this power; for such was the construction of the constitution in the papers of the federalist, written with the view of inducing the people of the states to adopt it; and recommending it to them because it invested the federal government “with full power to levy troops; to build and equip fleets; and to raise the revenues which will be required for the support of an army and navy, in the customary and ordinary modes practised by other governments. ” Federalist, No. 23. See also, Id. from No. 23 to No. 28, inclusive.
The failure to make special objection, at the time, because of the grant to Congress of the power of conscription is not surprising. There was no serious reason to apprehend that a government designing to overthrow the liberties of the people, would raise an army for the purpose, by a conscription of the very people whose rights were to be assailed; and it was obvious that if it should have the folly to do so, the army, when raised, would be the most efficient instrument that could be devised, for the defeat of the object in view. The danger really apprehended, from the grant of the power to raise and support armies, was that the federal government would be enabled to raise and keep in its pay an army of mercenary troops with no interests in common with the people; which might be used for the overthrow of their liberties and the destruction of the ^rights of the states. It was to this danger that the objections pointed. It was guarded against.by adding to the grant of the power to raise and support armies, a proviso that “no appropriation to that use should be for a longer period than two years ;” thus requiring the consent of every new Congress to the continuance of an appropriation for the support of the army. It was not deemed safe to go further than this in limiting the power of Congress on the subject. A proposition to limit the number of the army to be raised was rejected, because it was impossible to foresee what number the exigencies of the country might require. The objection to permitting a standing army to be kept up in time of peace was disregarded, because, when it was conceded that armies were necessary to protect the country from foreign aggression, it was manifest that it would be unwise to withhold the power to raise them until after hostilities had actually commenced. When it was resolved that the federal government should be entrusted with the common defence, it followed, as a corollary, that it ought to be “invested with all the powers requisite to the complete execution of the trust.” It was wisely determined therefore “that there should be no limitation of that authority which is to provide for the defence and protection of the community, in any matter essential to its efficacy; that is, in any matter essential to the formation, direction, or support of the national forces.” Fed. No. 23. As has been already stated, experience had shown that the exercise of the power of compulsion was necessary to raise an army of sufficient size for the necessities of the country in time of war. It had been habitually applied by the states in the war-from which the country had just .emerged. What then could be more natural or proper *183 than to entrust this power to the Pederal government along with the other war powers confided to it? Why should it be excepted from the *grant? Such exception would be opposed to the principle on which the grant was founded; apd might, at a time of critical danger to the country, render ■ the grant itself nugatory. The power to raise armies by conscription is less dangerous to the liberties of the people, than is the power of raising them by voluntary enlistment. An improper exercise of the power of conscription could not fail to excite at once the indignant opposition of the people; while an army might be improperly increased by voluntary enlistment without attracting much popular attention; and one thus raised would, as has been shown, be much more dangerous to the rights of the States, and the liberties of the people, than the one raised by conscription.
It is said, however, that the absence of a provision requiring the power of conscription to be exercised equally and uniformly, shows that it was never designed to be conferred upon Congress; for, without some such limitation, Congress may act most unjustly and oppressively, distributing the burden of raising an army unequally between the different states; and that any state is liable to have its whole armsbearing population withdrawn from it, and carried off, to any part of the world, in the ranks of the army.
To this it may be answered that this power, like all others, is unquestionably liable to abuse; though it does not seem probable that the attempt would ever be made to abuse it in the manner suggested. The protection against its abuse in this, or any other manner, is to be found in the responsibility of Congress to the people, ensured by their short tenure of office; and in the reserved right of each state to resume the powers delegated to the Confederate government, whenever, in her judgment, they are perverted to the injury or oppression of her pepple.
Again, it is objected that if the authority to raise ^armies gives to Congress the right to compel citizens to serve as soldiers, it embraces the whole war power, so far as relates to the raising of men ; and not only renders the provisions in reference to the militia supererogatory, but enables Congress to destroy the militia itself, by absorbing into the army all the men who compose it. And it is argued that it must therefore be inferred that the right of conscription does not exist; as it cannot be supposed that it was intended to confer power upon Congress to destroy the militia of the states.
It is true that the constitution does recognize the militia, and provide for using it, as well as regular armies, in the military service of the country. A well regulated militia has (as is, stated in one of the amendments) always been regarded as necessary to the security of a free state. It was therefore proper that provision should be made-in the constitution for its organization, and for the authority to be exercised over it by the state governments and Congress respectivelj'. It was not probable that in the exercise of the power to raise armies, Congress would, under ordinary circumstances, materially diminish the number of the militia. But it cannot be true that, with the view of presérving the militia entire, it was intended to deny to Congress the right to take individuals belonging to it for the regular army. This construction would prevent Congress from obtaining from its ranks not only conscripts but volunteers also; and as the militia embraces the whole armsbearing population, it would render it necessary that the army should contain none but foreigners hired for the purpose, and having no interest in common with the people of the country. No one can imagine that such was the intention of the framers of the constitution.
The true interpretation of the constitution in reference to this matter would seem to be, that the power to use the whole military force of the country was conferred *upon Congress, and it was left to their discretion to fix, as the varying necessities of the country might require, the relative proportion of regular troops and militia to be employed in the service. If it should appear at any time to be proper to increase the army, it might be done by taking men from the militia either as volunteers or as conscripts—the action in either case being upon the individual citizen, and not upon the militia as an organized body. As it was impossible to foresee how large an army the exigencies of the country might demand, the number of militiamen to be thus transferred to its ranks was wisely left to the discretion of Congress. It may be difficult to say to what extent Congress have the right, in the exercise of this discretion, to affect the militia, as an organized body. It is sufficient for the purposes of this decision to see, as we do, that neither of the acts of Congress, the validity of which has been called in question, does destroy or impair the organization of the militia; construing them, as it is proper that they should be construed, in connection with the exemption acts which are in pari materia. It will be time enough, when a case is brought before us in which the organization of the militia is destroyed or impaired by Congress, to enquire what limits are fixed to their action in this respect.
It is further, objected that if Congress have the right of compelling citizens to serve in their armies, the state governments are at their mercy, and exist at their will: that they may conscribe all of the officers of the state, executive, legislative and judicial; and thus put a stop to the action of its government. This objection is without foundation. Congress can have no such power over state officers. The state governments are an essential part of our political system; upon the separate and independent sovereignty of the states the foundation of our confederacy rests.
*184 All powers not delegated to the *Confederate States by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people thereof; and the Confederate States guarantee to each state a republican form of government.
It is absurd to suppose that the government of the Confederate States can rightfully destroy the governments of the states which created it; and all the powers conferred on it must be understood to have been given with the limitation that, in executing them, nothing shall be done to interfere with the independent exercise of its sovereign powers by each state. Congress can have no right therefore to deprive a state of the services of any officer necessary to the action of its government. And the state itself is the sole judge as to the officers that are necessary for that purpose.
But it is said that this is not enough to satisfy the rights and duties of the state as a sovereign. That each state has the right to command the services of all her citizens, and on the other hand is bound to afford them protection. That this right and duty are both interfered with by the exercise of the power of conscription by Congress; for by it the citizen may be dragged from his home and forced into the army, for service perhaps in a foreign land, against the wish of the state to which he belongs.
If, however, the power in question has been conferred upon Congress by the constitution, it is a mistake to say that it can be exercised without the consent of the states. For each state by ratifying the constitution gave her consent. We are brought again to the enquiry, is the power granted to Congress by the constitution? For the reasons already indicated we think it clear that it is. And it was wisely granted; for the rights of the states and liberties of the citizens can be much more effectually asserted and defended than they could possibly be if the power had been withheld.
*The objectipn that the states have been deprived of the power of appointing the officers is founded on the mistake of regarding the forces called out as “the militia.” They are not militia, but an army; created under the power given to “raise armies.” Not, it is true, a standing army to be kept up in time of peace, but a provisional army, brought into the field for service during the existing war. No power is reserved to the states, by the constitution, to appoint officers of the army, whether it be regular or provisional.
Fastly, it is objected to the acts under consideration that Congress do not themselves exercise the power of raising an army, but delegate it to the President.
We do not think that they are susceptible of any such interpretation. They delegate no authority to the President to raise an army; but merely authorize him to call out and place in the field the army raised under and by the laws. There can be no valid objection to the discretion given him to call out from time to time, as the necessities of the country might demand, those made liable to service by the laws. It was, on the contrary, eminently proper that, as commander in chief, he should be invested with such discretion.
For the foregoing reasons we are of opinion that the objections which have been taken to the constitutional power of Congress to pass the acts in question are not well founded, and that said acts should be sustained and enforced.
The next question for our consideration is, whether Congress possessed the constitutional power to pass the act approved on the 5th day of January 1864, entitled, “An act to put an end to the exemption of those who have heretofore furnished substitutes.” It is insisted that the government, in permitting substitution, entered into a contract with each individual in whose stead a substitute was accepted, that he should not *(except in certain contingencies specified in the regulations made by the Secretary of War), be required to render military service, during the period of time for which the substitute was put in; and that the law in question is unconstitutional and void because it violates this contract. The constitution of the Confederate States provides that no state shall pass any law impairing the obligation of contracts; but does not impose any restriction upon the power of Congress in this respect. It is insisted, however, that the omission to prohibit expressly the passage of such laws by Congress, resulted simply from the belief that such prohibition was unnecessary; and does not authorize the inference that Congress have the power to pass them. That if any legislature can violate its contracts, it is because of its unlimited powers, and its being beyond the pale of being questioned in any of its tribunals. That the Confederate government exists only by virtue of powers conferred on it; and, as no power has been granted it to break any engagement it may enter into, it has no right to break a contract which it has a constitutional right to make.
On the other hand it is said, that though it be true that the Confederate government has no right to exercise any power which has not been granted, yet that if, in the exercise of a granted power, a law should be passed impairing the obligation of a contract, such law will be valid and cannot be set aside by the courts. In support of this position they compare the clause of the constitution declaring that no state shall “pass any bill of attainder, or ex post facto law, or law impairing the obligation of contracts,” with the clause which declares that “no bill of attainder, ex post facto law, or law denying or impairing the right of property in negro slaves, shall be passed” by Congress; and they argue that it cannot be supposed that the words “or law impairing *the obligation of contracts” would have been omitted from the latter clause, if it had been intended that the power of Congress over1 *185 contracts should be as restricted as that of the states.
In the view we take of the matter before us, it is unnecessary to decide the question as to the extent of the power of Congress in this respect, and we express no opinion upon it. If the privilege of substitution had been granted upon a valuable consideration paid directly to the government, Congress would have a right to put an end to the exemption granted by reason of it, whenever in their judgment the situation of the country became such as to render it proper that the party should be again required to serve in the army. The arrangement of substitution cannot be made to extend further than to discharge the person putting in the substitute from the liability to which he is then subject under the existing law. No contract entered into by Congress can be enforced or sustained, unless it appear that the power to make such contract has been conferred by the constitution. No power has been granted them to agree that any person, liable to render military duty, shall be exempted, for any fixed time, from such liability, under any and every call for troops which the necessities of the country may require to be made. The obligation of the citizen to render military service is a paramount social and political duty. It is a matter in which the whole body politic is interested. “The citizens have a right collectively and individually to the service of each other to avert any danger which may be menaced. The manner in which the service is to be apportioned among them and rendered by them, is a matter for legislation.” The government, as the agent and trustee of the people, is charged with the whole military strength of the nation, in order that it may be employed so as to ensure the safety of all.
The power which it has to enforce the ^performance of the obligation to render military service is given that it may be used, not abdicated. No right has been conferred on the government to divest itself, by contract or otherwise, of the power of employing, whenever and as the exigencies of the country may demand, the whole military strength that has been placed at its disposal. As the nature and extent of those exigencies cannot be foreseen, and it is impossible to say in advance that the services of every citizen capable of bearing arms may not become indispensable for the defence of the country, the government has no right to enter into anjr contract precluding itself from requiring those services if they should be needed. If there be such right, the spectacle might be presented of a nation subjugated and destroyed at a time when it has within its limits citizens amply sufficient to defend it successfully against all the assaults of its enemies; but whose services, cannot be commanded because, forsooth, the government has contracted with them that they shall not be required to serve in the army.
It may possibly be said that our protection against this danger is to be found in the reserved concurrent power of the states to employ their military strength for the defence of the country. This might perhaps lessen our danger, but it does not meet the argument. The proposition is that the government of no nation can abdicate, or bind itself not to exercise, any part of the power entrusted to it for the defence of the community. And it cannot be supposed that it was intended, under our system of government, to confer the right upon congress to strip themselves of their power, and trust to the irregular, uncertain and tardy action of the several states to bring out the military force of the country.
It may be said also that the case supposed is an extreme one; and that it is not at all probable that any government would ever enter into contracts depriving *itself, to such an extent, of the right to exercise the powers with which it is invested. It is true that the case supposed is an extreme one, not likely to arise even if the right in question were possessed by governments. But it tests the principle. In determining the powers of governments we ought not only to look to what will probably be done, but we should look also to what may possibly be done under them.
No government can have the right to endanger the life of the nation it represents, by contracting that it will not exercise the powers confided to it. Tor a proposition so obviously true it can hardly be necessary to cite authority; but the authorities are ample to show that in less important matters than that of military defence, “a legislative bodj* cannot part with its powers, by any proceeding, so as not to be able to continue the exercise of them,” and if any attempt be made to do so the act is null and void. “It can and should exercise them, again and again, as often as the public interests require.” “It cannot abridge its own legislature power, by making permanent and irrepealable contracts in reference to matters of public interest.” East Hartford v. Hartford Bridge Company, 10 How. U. S. R. 511; Goszler v. The Corporation of Georgetown, 6 Wheat. R. 593. In the case of The Ohio Life Insurance and Trust Company v. Debolt, 16 How. U. S. R. 416, in which the question was as to the validity of a state law, Chief Justice Taney says, “The powers of sovereignty confided to the legislative body of a state are undoubtedly a trust committed to them, to be executed to the best of their judgment for the public good; and no one legislature can by their own act disarm their successors of any of the powers or rights of sovereignty confided by the people to the legislative body, unless they are authorized to do so by the constitution under which they are elected.”
*We think therefore that if it appeared that congress had attempted to make a binding and irrepealable contract to exempt from liability to all subsequent calls for military service those who put in substitutes, during the time for which they were put in, such contract would be *186 void because of the want of power in congress to make it. But there has been no attempt 'to make any such contract. Exemption from future liability on the part of a citizen to render military service at the call of the country, is not a subject matter of contract, within the meaning of the clause of the constitution prohibiting the passage of any law impairing the obligation of contracts. By the term “contracts” in that clause it is not meant to include rights and interests growing out of measures of public policy. Acts in reference'to such measures are to be regarded as rather in the nature of legislation than of compact, and although rights or interests may have been acquired under them, those rights and interests cannot be considered as violated by subsequent legislative changes which may destroy them. Whatever in the nature of a contract could be considered to exist, there must be implied in it a condition that the power is reserved to the legislature to change the law thereafter as the public interest may from time to time appear to require. In delivering the opinion of the whole court in the case of Butler v. Pennsylvania, 10 How. U. S. R. 416, Mr. Justice Daniel says, ‘ ‘The contracts designed to -be protected by the tenth section of the first article of the Federal constitution are contracts by which perfect rights, certain, definite, fixed private rights of property are vested. These are clearly distinguishable from measures or engagements adopted or undertaken by the body politic or state government, for the benefit of all, and from the necessity of the case, and according to universal understanding to be varied- or discontinued as the public good may require.” Accordingly it was *held in that case that an appointment to a public office which by the existing law of the state was to be held for one year with a fixed per diem compensation, does not amount to a contract by the state thus to employ and pay the officer during the year. So that a law repealing the one under which the officer went in, and directing that the office should be vacated before the expiration of the year, and that the officer, in the meantime, should receive a smaller per diem compensation than he was entitled to under the law, by virtue of which he was appointed, was held to be valid; and the officer who continued to discharge the duties of the office, from the day fixed by the lat-. ter statute for the reduction of his compensation, until the day when the office was vacated, was held to ■ be entitled to the reduced compensation only, and not to that fixed by the statute under which he received, his appointment. See also East Hartford v. Hartford Bridge, 10 How. U. S. R. 511; and the opinion of Mr. Justice Campbell in the case of State Bank of Ohio v. Knoop, 16 How. U. S. R. 369, 405. So, divorces granted by the legislature of a state do not (according to the great preponderance of-authority, and as we think in accordance with sound principle) impair the obligation of contracts, within the meaning of the constitutional inhibition; because marriage, although usually denominated a contract, and certainly one in some senses, is also a status or civil relation, and therefore subject to legislative control. Bishop on Mar. and Div. jj 771 to § 775. Where a seizure was made by a revenue officer, under a promise, contained in a law of the United States, that on conviction he should share the forfeiture; and a condemnation was regularly had adjudging the forfeiture to have been incurred, it was held that a discharge of the forfeiture by the Secretary of the Treasury, without making compensation to the revenue officer, who had incurred trouble and expense *in making the seizure and procuring the condemnation, was no violation of vested rights, or impairment of the obligation of a contract. United States v. Morris, 10 Wheat. R. 246. See also the cases of The State Bank of Ohio v. Knoop, 16 How. U. S. R. 369; The Ohio Life Insurance and Trust Company v. Debolt, Id. 416; Alexander v. The Duke of Wellington, 2 Russ. & Myl. 35, 6 Cond. Eng. Ch. R. 383; The Elsebe-Maas, 5 Chr. Rob. Adm. R. 155. For the marked distinction between an engagement to render military service and a contract, the cases of The United States v. Cottingham, 1 Rob. R. 615, and The United States v. Blakeney, 3 Gratt. 405, decided by our own court may be referred to. To-borrow the language of Mr. Justice Campbell in the case of The State Bank of Ohio v. Knoop, and apply it to the cases before us: “A plain distinction exists between statutes which create hopes and -expectations, and those which form contracts.” Congress allowed exemptions from military service to those who furnished substitutes, “on existing considerations of policy, without annexing restraints on their will, or abdicating their prerogative, and consequently are free to modify, alter or repeal .them. ”. Whatever therefore may have been the expectation, at the time, in reference to the extent of the exemption obtained by putting in a substitute, there was clearly no contract the obligation of which has been impaired, and no vested right which has been violated by the passage o.f the law putting “an end to the exemption from military service of those who have heretofore furnished substi-. tutes.”
The truth seems to be that substitution was permitted as an act of grace and favor on the part of the government, and not as a matter of contract. The government received nothing except the service of one man in the place of another to whose service it was entitled. The consideration paid by the principal for the service *of the substitute was a matter of private arrangement between them, with which the government had nothing to do. It is true that under a regulation made by the Secretary of War, the substitute was not received for less than three years or the war, although the party putting him in may not have had so long to serve. And it is said that, in this way, the government *187 received more than a mere equivalent for the service of the principal. The advantage gained by the government is rather seeming than substantial. Por the government has the undoubted right, on the expiration of the time for which the principal is liable, to make a new call upon him, and compel him to serve so long as the necessities of the country may require. The only advantage then it can be said to have gained is that it has relieved itself from the inconvenience of having to make a new call as soon as it might otherwise have been required to make it; and this advantage cannot be regarded as a material one. Indeed it was found that substitution on these terms was so disadvantageous to the service, that before the passage of the act now under consideration, one was passed prohibiting entirely all future substitution. It was originally permitted as a privilege to individuals, and not from any benefit the government expected to derive from it; and it did not cease to be a privilege because of the terms imposed as a condition of granting it. It is said, however, that where the substitute is in service, at - the time that the principal is again called in, the government gets the service of two men; when but for the substitution it would have had the service of one of them only. This is an incident of the substitution which may result favorably to the government in the case supposed; but it is not perceived that either the principal or the substitute has a right to complain. The substitute is required to serve no longer than he has, for a consideration satisfactory to himself, ^agreed to serve; and the principal has received all he has a right to claim under the exemption granted him. But even if the permission granted by Congress to individuals to put in substitutes could be held to amount to a “contract” by which Congress was irrevocably bound, what would be the true interpretation of such contract? The well established rule of construction is that all grants of privileges and exemptions from general burdens are to be construed liberally in favor of the public and strictly as against the grantee. Whatever is not plainly expressed and unequivocally granted is to be taken to have been withheld. Charles River Bridge v. Warren Bridge, 11 Pet. R. 420; The Richmond R. R. Co. v. The Louisa R. R. Co., 13 How. U. S. R. 71; State Bank of Ohio v. Knoop, 16 How. U. S. R. 369; The Ohio Life Insurance and Trust Co. v. Debolt, Id. 416. It would be especially improper to infer, in the absence of the most distinct indication of intention, that Congress designed in any grant to go further than the constitution allows them to go. But it is not necessary to apply a strict rule of construction. No fair interpretation of the law can make it a grant of exemption from liability to service under laws which might thereafter be passed as the necessities of the country might from time to time require. The 9th section of the act of 16th April 1862 provides, “That persons not liable for duty may be’ received as substitutes for those who are, under such regulations as may be prescribed by the Secretary of War.” This is the whole provision on the subject. There is not one word to show that it was intended to extend the exemption from liability, by reason of having furnished substitutes, to any liability other than that created by the act. On the contrary the language is, “persons not liable for duty may be received as substitutes for those who are.” What duty and liability are referred to? The duty and liability, *of course, imposed by the law of which this section forms a part, and no other. When the liability was extended to other persons by the amendatory act of 27th September 1862, the privilege of substitution was also extended to those then made liable, by the provision that nothing therein contained should be understood as repealing or modifying any part of the act of 16th April 1862, except so far as was therein expressly stated. Nor is there any thing in the regulations made by the Secretary of War under the authority conferred on him by these acts, from which it can be inferred that the exemption could be made to extend to any liability other than that created by the acts themselves. If it had been supposed that those furnishing substitutes were to be relieved from liability to future calls, during the period of time for which the substitute was furnished, an exemption paper so stating in express terms would have been given. Instead of such a paper we find that nothing more was ever given than a simple discharge from the army. Again, whatever might be the power of Congress, no one can pretend that the Secretary of War had any right, without express authority of law, to make a contract for exemption which would relieve the party from liability under any call for service that might be made by Congress, during the time for which the Secretary’s exemption lasted. Now the law permitting substitution merely gave the sanction of Congress to a practice which had previously prevailed under orders of the Secretary. It made no change in that practice, and there is nothing to show that it was designed to extend the exemption by reason of substitution, beyond the limits within which it was confined under it.
The nature of the transaction, the terms of the act, and the regulations and practice under it, all show that according to the true intent and meaning of the parties the person furnishing a substitute was to be relieved *from the liability then resting on him, under existing laws, to render military service, and from that only. There is nothing to show that it was designed to exempt him from any service which the future wants of the country might make it proper for Congress to require of him. He may, it is true, have entertained the belief that the necessities of the country would not be such as to require another call to be made upon him; and so have hoped and expected that by putting in the substi *188 tute he would in fact be relieved from the performance of military service during the time for which he was put in. The disappointment of these hopes and expectations can give him no right to complain. If he has sustained loss, it is damnum absque injuria. The government has been guilty of no such breach of faith; for if the transaction be called a contract, he has had the benefit of all that he contracted for; namely, exemption from service until the situation of the country became such as to make it necessary that he should again be called upon to take part in its defence. The act putting an end to the exemption from military service of those who have furnished substitutes, commences with the recital, ‘ ‘Whereas in the present circumstances of the country it requires the aid of all who are able to bear arms;” thus showing, on its face, that but for the pressing necessity of the country the exemption would not have been taken away.' It would be beyond the jurisdiction of this court to enquire whether Congress was right or wrong in supposing such necessity to exist. Of its existence, Congress, to whose discretion it is confided to provide means adequate to the defence of the country, have the exclusive right to judge.
But it is objected that the law is unconstitutional and void, because it makes no provision for compensating those whose exemptions are taken away. It is said that the privilege of exemption is a valuable right; and if *the public necessity requires that the citizen should be deprived of it, it can be taken only upon making to him a just compensation.
We have seen that the transaction is one relating to a matter of. public concern as to which Congress could not, if they would, make any valid contract which would entitle the party to compensation ; and further that they have not attempted to make any such contract. It has also been shown that even if the transaction could be regarded as a contract, the government has fully complied with its engagement, and has deprived the party of no right; for the condition has happened, upon the happening of which, by the contract itself according to its true interpretation, the exemption was to cease. If there should be any case presenting an equitable ground for relief or indemnity, it is a matter of which the courts can take no cognizance.
The only remaining question is, whether the petitioner Burroughs, who claims to have put in his substitute under the law of this State, passed on the 10th day of February 1862, stands on a different footing, as to this matter, from those who have put in substitutes under the act of Congress.
It has been very much disputed, in the argument of the case, whether he did really put in a substitute under the State law, in such a way as to entitle himself to a discharge from service according to its provisions. We consider it unnecessary to enter upon an examination of this question; because, supposing him to have acted in strict conformity with the requirements of that law, and to have become entitled to a discharge from service, in accordance with its provisions, we do not think that he occupies a better position than those do who put in substitutes and obtained their discharge under the law of Congress. The law of the State, like the law of Congress, exempted only from the then existing liability to render military service, and did not (as it could not properly) undertake to exempt from future liability, if the necessities of the country should make a further call necessary. The act of Congress of 16th April 1862, operated upon all white men who were residents of the Confederate States, between the specified ages, and not legally exempted, whether they were in or out of the army. Those in the army, however the}' had been put there —whether under requisitions upon the states, or as volunteers turned over by state authority, or in any other manner—became liable to service under the act of Congress, which superseded all previous laws, and all calls that had been made for troops. Those who had put in substitutes under State authority had a right to enjoy the benefit of the substitution in like manner as if it had been effected under the orders of the Secretary of War, or the act of Congress; and this right has always belen recognized and allowed by the Confederate government. But they have no claim to stand on any higher ground than those who put in substitutes under Confederate authority.
We are of the opinion therefore that each of the petitioners is liable to render military service, and must be remanded to the custody of the respondent.
The motion to discharge the petitioners overruled, and they remanded to the custody of the .officer.