The petitioner was, prior to 26 April, 1864, a lieutenant in the Army of the Confederate States; but by an order of that date he was dropped from the roll as an officer. At the August Term, (501) 1864, of the Court of Pleas and Quarter Sessions for the county of Hyde, he was elected register of deeds of the county, and was duly qualified as such by entering into bond and taking the necessary oaths. Subsequently, to wit, on 22 September, 1864, he was ordered as a conscript by the enrolling officer of the county, to report himself without delay to the camp of instruction, near Raleigh. The date of enrollment is not distinctly specified either in the petition or return, though it is strongly to be inferred from the allegations of the petitioner that it was prior to his election as register. That, however, I consider as immaterial, because I think that under the army regulations he was in the military service as a private as soon as he was dropped from the roll as an officer. See Army Regulations.
It is agreed by the counsel that a register of deeds of a county is a civil officer of the State, and that the Governor had claimed the petitioner as an exempt from military service in the Army of the Confederate States.
Upon this statement of facts, it is contended by the counsel for the petitioner, first, that he is entitled to a discharge from custody, upon a just construction of the second paragraph of section 10 of the act of Congress ratified on 17 February, 1864, though he was in the military service when he was elected register of deeds of Hyde County. Secondly, if that be so, that after his election and qualification as a civil officer of the State, he became exempt from any further service in the army of the Confederate States, because Congress has no power to restrict the State in the selection of any of its citizens, whether in or out of the army, to fill any office necessary to the action of the Government. I differ from the counsel as to the correctness of his position, and will proceed to state, as well as I can, the reasons upon which my opinion is founded:
(502) 1. In ascertaining and settling the construction of the military act of February, 1864, it is proper to avail ourselves of any light which may be thrown upon the subject by any statute in pari materia, particularly if it were passed about the same time. 1 Bl. Com., 60.
It appears from the act of Congress approved 5 January, 1864, entitled "An act to put an end to the exemption from military service of *Page 323 
those who have heretofore furnished substitutes," that the country was then in very great need of soldiers. The preamble recites that, "Whereas, in the present circumstances of the country, it requires the aid of all who are able to bear arms, the Congress of the Confederate States do enact," etc. This most pressing want of the Confederate Government is, if possible, still more strongly shown in the act under consideration. It repeals all former laws which granted exemptions, and thus at once sweeps away the long list of exempts which may be found in the act of October, 1862. It enlarges the ages of conscripts from 18 and 45 to 17 and 50, thus calling into the field of active service boys and old men. It takes from their homes almost every person capable of bearing arms, except those officers who are necessary to the proper administration of the Confederate and State governments, and a few others who were deemed necessary to carry on the educational, industrial, and other indispensable pursuits of the country, with the addition of a still fewer number who are restrained from bearing arms by religious scruples. With this most urgent, pressing demand for soldiers for the defense of the country in its life and death struggle for National existence, placed thus prominently before us, have we a right to infer that Congress intended, by the exemptions which it granted in the act of February, 1864, to release from further service in the army any soldier whom it had a right to retain there? It seems to me to be ignoring the whole spirit of the act to suppose so. I cannot come to any such conclusion unless I find it so declared by the express terms of the act.
So far from finding any express declaration in the act to that (503) effect, the terms of exemption may be fully satisfied by confining them to the persons filling offices, occupying positions, or engaged in pursuits at the time of their enrollment. In some cases the persons exempted must have been employed in the duties of their office or profession at the date of the act, and could not entitle themselves to an exemption by subsequently engaging in such office or profession, even prior to the time of their enrollment. This is the case with regard to ministers of religion, physicians, and schoolmasters.
All the farmers of the country are put into the army, except the bonded overseers of fifteen able-bodied field hands, and even they, it seems, might have been deprived of the benefit of this exemption had they been enrolled since 1 February, 1864, but for a special provision in their favor. See paragraph 4 of section 10 of the act of February, 1864. Looking then, over the whole act, from the first section to the last, I am unable to discover anything, either in its language or spirit, which releases or exempts from service any person already in the army as a soldier. The fact that, by another act of Congress, officers and soldiers in the army may become exempt from further service by being elected to *Page 324 
certain officers or places of trust, either in the State or Confederate Government, does not affect the present case, which depends, in the view in which I am now looking at it, entirely upon the construction of the act of February, 1864.
2. The second position taken for the petitioner by his counsel is a much more important one, affecting as it does the relative powers and rights of the Confederate and State governments; and I, therefore, approach its discussion with much diffidence, particularly as I find that the conclusion at which I have arrived is at variance with the (504) opinion entertained by many for whose learning and ability I entertain the highest respect. The difficulties of the case arise from the fact that the same persons are citizens of two separate and distinct sovereigns, to both of which they owe duty and allegiance. If the constitutions upon which their respective governments are based be rightly construed, and rigidly adhered to, there will be little or no danger of their clashing or interfering with each other in their respective demands of service from the people. In the distribution of the powers of sovereignty it is conceded that the States have conferred upon the Confederate Government the war power; that is, the power to declare war and to raise and support armies. It has been held by all the greatest statesmen and judges of the country that this power is, with a slight exception, unlimited. In aid of this and the other powers vested in the General Government, the Constitution declares that Congress shall have power "to make all laws which shall be necessary and proper" for carrying them into execution. See Art. I, sec. 8, par. 18. And it asserts the supremacy of the Confederate States, as to the powers conferred upon the Government, by declaring that "this constitution, and the laws of the Confederate States made in pursuance thereof, shall be the supreme law of the land; and the judges in every State shall be bound thereby, anything in the Constitution or laws of any State to the contrary, notwithstanding." Although the war power of the Confederate Government is thus absolute and unlimited in terms, and the supremacy of that Government over the States, with regard to that power, is thus clearly and distinctly asserted, it has been decided, and I think rightly decided, that the Confederate Government cannot, in the exercise of the war power, destroy the States, by conscribing those officers who are necessary to the action of the State governments. See Burroughs v. Peyton, 16 Gratt., 470, decided by the Supreme Court of Appeals of (505) Virginia, and recognized as authority in Johnson v. Mallett, ante, 410, decided by this Court. Whatever persons filled any office in the State which the Legislature declared to be necessary for the State Government when the act of February, 1864, was passed, were thereby placed beyond the power of conscription by the Confederate *Page 325 
Government. That government is founded upon the State governments as sovereigns, and cannot exist without them. The superstructure must fall when its pillars are taken away or destroyed.
But the case is reversed when the Confederate Government has, in the exercise of its rightful supreme war power, conscribed into its service a man who is not an officer of the State, and the State is attempting to take him out of it by electing him to an office. The man, as a citizen, owed the duty to the General Government which it had called upon him to perform, just as much as he owed the duty to the State to accept and discharge the duties to which he was elected. Here are two obligations undoubtedly binding upon the man, but which, being inconsistent, cannot both be performed at the same time. How can this conflict be settled but by resorting to a principle of potent efficacy both in international and municipal law, that priority of possession gives priority of right? This would seem to be a just rule, even if the two governments were equal in their powers with respect to the subject; and it surely cannot operate against that government whose power in that particular is supreme.
The State must, in such a case, yield to the prior claim of the General Government, and select some other man to fill its office. The argument, that perhaps the State cannot find another person out of the army fit for the place, is answered by the equally probable supposition, that the General Government may not be able to procure another fit person for a soldier. When either supposition shall become certainty, it will be when both governments are on the eve of destruction.
The petitioner, in the present case, is not one of the officers of (506) the State who is recognized in its Constitution as being essential to the Government. If he were so, the argument in his favor would be much stronger, perhaps irresistible. The Constitution declares, in express or necessarily implied terms, that there shall be a Governor, judges of the Supreme Court, justices of the peace, a sheriff, a coroner or coroners, and constables in each county; a Secretary of State and several other officers; also members of both houses of the General Assembly; and it may be that with regard to all these the State never surrendered the right to have the offices and places filled by any of her citizens, whether they should be at the time of their election in the service of the General Government or not. This is a question of the highest importance to both governments, and I will not undertake to decide upon it until it becomes necessary, in the performance of my judicial duty, to do so. It may also deserve more consideration than the subject has yet received, whether the Legislature can deprive the State of any of these *Page 326 
constitutional officers by permitting them to be conscribed, as it purports to do as to some of them, by the act of 14 December, 1863. See laws of the extra session in December, 1863, ch. 14.
My conclusion, upon a full consideration of the whole matter, is that the judgment which I rendered in vacation, in favor of the petitioner, founded, as I expressed at the time, upon the previous case of In reRussell, ante, 388, decided by the Chief Justice, was erroneous, and ought to be reversed, with costs, and that the petitioner must be remanded to the custody of Major Peter Mallett, commandant of conscripts.