STAPLES, J.
The opinion just delivered by Judge Christian is an affirmance of the doctrines laid down in Antoni v. Wright. It was my misfortune to dissent, not only from the decision in that case, but the reasoning by which it was supported. Since that time the subject has received a full and exhaustive discussion in the public press, upon the hustings and in the legislature. That discussion and my own deliberate reflections have but confirmed my convictions of the soundness and justice of the views then entertained. I do not see, however, that any good can be effected by a further discussion of the question. Every one here present — • every intelligent mind in the state — has, perhaps, reached some fixed conclusion upon the subject, and nothing that can now be said by myself or others will tend to change or modify that conclusion. I will not, therefore, now undertake to enter into any discussion of those points with respect to which it was my misfortune in the. former case to differ with a majority of this court. This much may be said: If it is now to be considered as the settled rule of this court that every demand, debt, claim of the commonwealth, *of whatever character or description, to the amount of one million and two hundred thousand dollars annually, may be paid in these coupons; if the legislature, under no circumstances, has for the next thirty years the power to diminish the rate of taxation, whatever may be the condition or necessities of the people; if, during that time, whatever may be the public exigencies, the revenues of the state are irrevocably dedicated to the creditor; if, to such an extent and for such a time the legislature has surrendered all control of the revenues and resources of the state beyond recall, then, indeed, has the government abdicted its functions, and the state is stripped of one of its most essential attributes of sover *61 eignty. We can form some faint idea of the magnitude of the surrender and of the principle involved in it when we remember that under the funding bill the entire public debt might have been funded but for the subsequent legislation arresting its operation.
To all this but one answer has ever been given, and that is, it is the duty of the legislature to lay a sufficient tax each year to pay the creditor and carry on the government. To this it may also be answered, that no legislature has the power to impose on succeeding legislatures such a duty. However strong the obligation of the public debt may be, there are periods in the history of every state when no part of it can be paid; when the government creditor and individual creditor must consent to wait for a season; and of such periods as they arise the legislature, and not the courts, must be the judge. Instances of the kind are found in the late civil conflict between the north and the south, and in times of great financial distress and disaster, when the collection of debts is universally suspended; and others will hereafter, no doubt, occur when such a suspense is essential to the public safety. The amount of taxation the people can bear— the mode and manner of imposing it —is a political question Ho be determined by the representatives of the people, from time to time, as the public exigencies may require.
This is the essential principle of the governments under which we live — state and federal. If is the vital element of all representative governments. In the language of the supreme court of the United States a legislative body cannot part with its power by any proceeding so as not to be able to continue the exercise of them. It cannot abridge its own legislative power by making permanent and irreparable contracts in reference to matters of public interest. East Hartford v. Hartford Bridge Co., 10 How. U. S. R. 511, 535; see also State Bank of Ohio v. Knoop, 10 How. U. S. R. 408; Ohio Life Ins. and Trust Comp. v. Debolt. 16 How. U. S. R. 416; Burroughs v. Peyton, 16 Gratt. 470.
With this brief discussion I am content to leave this branch of the subject, having already said, perhaps, more than was necessary. It may be proper further to say that the precise question now before us did not arise and was not decided in Antoni v. Wright. It is true it was discussed both by Judge Bouldin and Judge Anderson; and while it is perhaps covered by their reasoning, it was not necessarily decided. It is, therefore, an open question.
I agree that the funding act is broad enough to include fines imposed for the violation of the penal laws; and upon that ground I thought, and still think, it violates the seventh section of the eighth article of the constitution of Virginia. That section declares : “The general assembly shall set apart as a permanent and perpetual literary fund, the present literary funds of the state, the proceeds of all public lands donated by congress for public school purposes, of all escheated property, of all waste and unappropriated lands, of all fines accruing to the state by forfeitures, of all fines collected for offences *committed against the state, and such other sums as the general assembly may appropriate.”
Will it be maintained that it is competent for the legislature, by any contract made since the adoption of the present constitution, to divert the funds mentioned in this section from the objects therein designated? Take, for example, the proceeds of the public lands dedicated by congress for school purposes. If these lands, when sold by the state, may be paid for in coupons, are the proceeds set apart for the specific purposes prescribed by the constitution? Are they not in fact indirectly appropriated to the payment of the public debt? The same is true with reference to fines, instead of being “set apart as a permanent and perpetual literary fund,” according to the requirement of the constitution, they will be applied to the interest on the public debt. There is no practical difference between a law which directly hands them over to the state creditors, and a law which allows them to be paid in coupons.
The answer to this again, is, that the legislature must increase the taxes, and supply the deficiency from other sources. But the question still arises, can one legislature divert a fund from the purposes of a trust under the constitution, and rely upon another legislature to raise another fund from some other source with which to execute the trust. Suppose the succeeding legislature fails in its duty, what becomes of the constitutional requirement? The main design of the provision already cited was the creation of a fund beyond the reach of the legislature, in nowise dependent upon popular caprice for its preservation and application.
It is very true that the fines have heretofore been paid into the treasury indiscriminately with other public dues, and so long as the whole was paid in money no injustice or inconvenience could arise. But now the question is presented in an entirely different aspect. For if the Hcgislature shall pass a law, as it ought long ago to have done, carrying out this provision of the constitution and setting apart the fines for school purposes, under the . present ruling of the court the act must be held unconstitutional, because the funding bill authorizes the payment of all state dues in coupons. And thus it is that an unconstitutional contract is made paramount to the constitution. One legislature, by an agreement with the public creditor, may appropriate to his claim a fund set apart by the constitution irrevocably for another purpose, and if succeeding legislatures fail to supply the deficiency from other sources, there is no remedy for the breach of trust and a palpable infraction of that instrument. 1 can never give my assent to these positions. It is the duty of the legislature, by taxation, to pay the indebtedness of the state. It cannot for that purpose appropriate other revenues which by the constitution are placed beyond *62 its control. Upon this point I think the argument of the attorney-general was unanswerable.
It is said, however, that the-duty of the state to pay its debts is of paramount obligation to that of providing fo‘r the education of its people; and the conclusion sought to be deduced from this is, that the constitutional provision dedicating certain funds to the cause of education, leaving the public debt unpaid, is inoperative and void.
The moral obligation of a state to pay its debts is not denied; but it has never been seriously contended by any one familiar with the principles of our government, that this obligation can be enforced by law. If the people of the state do not voluntarily raise the means by taxation to pay the public creditor, there is no way of coercing them. If this be not so, the holders of the unfunded debt will be very glad to know it, as they have not received one dollar of interest, and there is- but little probability of their doing so in the present condition of affairs. At the time of the adoption of the present constitution *the state was free to appropriate its revenues to any objects whatever. It will scarcely he contended there was anything to_prohibit; prevent the dedication of the funds named in the seventh section to the cause of education. That section, when adopted, became the supreme law of the land; and no legislature could by a contract with 'a creditor, or. by any device or contrivance whatever, evade the force and effect of the provision. The contract, if it is to be so termed, was an usurpation, so far as it attempted to appropriate the school fund to the payment of the public debt. For these reasons I cannot concur in the opinion just delivered.
Let me say in conclusion, however, I concur now, as I did then, with what was said by Judge Christian in the Homestead cases; that is, “The inviolability of contracts, public and private, is the foundation of all social progress, and the corner stone of all forms of civilized society, wherever an enlightened jurisprudence prevails.” Good faith is as essential in states as in men. Neither can be just or permanently prosperous without it. Upon that subject my own voice, feeble as it is, can never have any uncertain sound. When we speak of a contract, however, involving the public faith, such as the courts ran enforce, we mean a contract sanctioned by the constitution and the principles of government under which we live. Believing that the funding bill is in violation of both, I am for refusing the mandamus in this case.