# SELECTIVE DRAFT LAW CASES.[1]

ERROR TO THE DISTRICT COURTS OF THE UNITED STATES
FOR THE DISTRICT OF MINNESOTA AND THE SOUTHERN
DISTRICT OF NEW YORK.

Nos. 663, 664, 665, 666, 681, 769.  Argued December 13, 14, 1917.—Decided January 7, 1918.

The grant to Congress of power to raise and support armies, considered in conjunction with the grants of the powers to declare war,
to make rules for the government and regulation of the land and
naval forces, and to make laws necessary and proper for executing
granted powers (Constitution, Art. I, § 8), includes the power to
compel military service, exercised by the Selective Draft Law of
May 18, 1917, c. 15, 40 Stat. 76.  This conclusion, obvious upon
the face of the Constitution, is confirmed by an historical examination of the subject.

The army power, combining the powers vested in the Congress and
the States under the Confederation, embraces the complete military power of government, as is manifested not only by the grant
made but by the express limitation of Art. I, § 10, prohibiting the
States, without the consent of Congress, from keeping troops in
time of peace or engaging in war.

The militia power reserved to the States by the militia clause (Art. I,
§ 8), while separate and distinct in its field, and while serving to
diminish occasion for exercising the army power, is subject to be
restricted in, or even deprived of, its area of operation through the
army power, according to the extent to which Congress, in its discretion, finds necessity for calling the latter into play.

The service which may be exacted of the citizen under the army
power is not limited to the specific purposes for which Congress is

---

[1] The docket titles of these cases are: *Arver* v. *United States,* No. 663,
*Grahl* v. *United States,* No. 664, *Otto Wangerin* v. *United States,* No. 665,
*Walter Wangerin* v. *United States,* No. 666, in error to the District
Court of the United States for the District of Minnesota; *Kramer* v.
*United States,* No. 681, *Graubard* v. *United States,* No. 769, in error to
the District Court of the United States for the Southern District of
New York.

expressly authorized, by the militia clause, to call the militia; the presence in the Constitution of such express regulations affords no basis for an inference that the army power, when exerted, is not complete and dominant to the extent of its exertion.

Compelled military service is neither repugnant to a free government nor in conflict with the constitutional guaranties of individual liberty. Indeed, it may not be doubted that the very conception of a just government and its duty to the citizen includes the duty of the citizen to render military service in case of need and the right of the government to compel it.

The power of Congress to compel military service as in the Selective Draft Law, clearly sustained by the original Constitution, is even more manifest under the Fourteenth Amendment, which, as frequently has been pointed out, broadened the national scope of the government by causing citizenship of the United States to be paramount and dominant instead of being subordinate and derivative, thus operating generally upon the powers conferred by the Constitution.

The constitutionality of the Selective Draft Law also is upheld against the following objections: (1) That by some of its administrative features it delegates federal power to state officials; (2) that it vests both legislative and judicial power in administrative officers; (3) that, by exempting ministers of religion and theological students under certain conditions and by relieving from strictly military service members of certain religious sects whose tenets deny the moral right to engage in war, it is repugnant to the First Amendment, as establishing or interfering with religion; and (4) that it creates involuntary servitude in violation of the Thirteenth Amendment.

Affirmed.

THE cases are stated in the opinion.

Mr. *T. E. Latimer*, with whom *Mr. Herbert L. Dunn* and *Mr. Frank Healy* were on the briefs, for plaintiffs in error in Nos. 663, 664, 665 and 666.

Mr. *Harry Weinberger* for plaintiff in error in No. 681.

Mr. *Edwin T. Taliferro*, with whom *Mr. I. M. Sackin* was on the brief, for plaintiff in error in No. 769.

*Mr. Hannis Taylor* and *Mr. Joseph E. Black,* by leave of court, filed a brief as *amici curiæ.*

*Mr. Walter Nelles,* by leave of court, filed a brief as *amicus curiæ.*

*The Solicitor General,* with whom *Mr. Robert Szold* was on the brief, for the United States.

---

These cases were argued and submitted together with *Jones* v. *Perkins, infra,* 390; *Goldman* v. *United States, infra,* 474; *Kramer* v. *United States, infra,* 478; and *Ruthenberg* v. *United States, infra,* 480. The briefs filed by the parties and *amici curiæ* opposed to the Government attack the constitutionality of the statute from every standpoint. As it is manifestly impracticable to restate these arguments separately, perhaps the best recourse available is to exhibit their leading features reflexly, by summarizing the answers to them contained in the single brief of the United States, viz:

The highest duty of the citizen is to bear arms at the call of the nation. This duty is inherent in citizenship; without it and the correlative power of the State to compel its performance society could not be maintained. Vattel, Law of Nations, Book III, c. 2, §§ 8, 10. It is a contradiction in terms to say that the United States is a sovereign and yet lacks this power of self-defense. Hence, the power was expressly granted by the Constitution. Art. I, § 8. It is found in the power to declare war, which means a power to carry on war successfully, i. e., with the means necessary. Vattel, Book III, c. 2, § 7; *United States* v. *Sugar,* 243 Fed. Rep. 423, 436; *Kneedler* v. *Lane,* 45 Pa. St. 238. Also in the power to raise and support armies, which is conferred broadly, and without limitation, other than the restriction that appropriations to support armies shall not exceed two years. There is no provision

366.            Argument for the United States.

limiting the means to voluntary enlistment. On the contrary, Congress is expressly empowered to use all means necessary and proper to carry out the express grant. Hence, the power to resort either to voluntary enlistment or to enforced draft is express. Selective draft is not only an appropriate means but under the conditions of modern warfare the most prudent, just, and equitable method which can be employed. That the power to compel military service is an incident of sovereignty appears from the custom of nations. Compulsory service is now exacted by practically all the nations of the globe. The compulsory draft was a normal method of raising armies in the United States in 1787 when the Constitution was adopted. It was expressly recognized in many state constitutions, was enforced by the States for local purposes in calling out the militia, and also for obtaining levies to fill the ranks of the Continental Army. The constitutions of five States during the Revolutionary War period express the principle of universal military service. Militia duty was imposed upon all arms-bearing citizens of the original thirteen States during the eighteenth century. The Continental Congress recommended it to the States as a means of recruiting the Continental Army; and the numerous statutes enacted pursuant to those recommendations [space will not permit of their citation here] conclusively determine the meaning which the framers of the Constitution attached to the power to raise armies. The history of this clause in the Convention shows a definite intent not to limit the nation to voluntary enlistments. Supp. Elliot's Debates, vol. 5, pp. 378, 379, 443, 510, 511, 553; Farrand's Records of the Federal Convention, vol. 2, pp. 323, 330, 505, 509, 570, 595. Several of the States, in ratifying the Constitution, proposed amendments to limit the power of Congress to raise armies by draft, Journals of Congress, vol. 13, appendix, pp. 176, 184, Folwell's Press, 1801;

Elliot's Debates, vol. 1, p. 336; vol. 3, p. 659; vol. 4, pp. 242, 244, 251, 252; and their rejection shows not only that the language employed was intended to include the power to draft but also that this was the contemporary interpretation. A prime object of the Constitution was to cure the impotence of the Continental Congress directly to require military service from the citizens of the States. Articles of Confederation, 7, 9 (1 Stat. 6, 7); Federalist, No. 22, p. 143, No. 23, pp. 152, 153; 7 Sparks, Writings of Washington, pp. 162, 167.

Our national history demonstrates the existence of the power by its exercise. It was resorted to in the War of Independence and by both sides in the Civil War; near the conclusion of the War of 1812, James Monroe, then Secretary of War, submitted to Congress a draft bill with an unanswerable argument supporting the power. See Niles' Weekly Register, vol. 7, p. 137. [The Government also referred to state statutes requiring compulsory militia service in force before and after the adoption of the Constitution; Rev. Stats., § 1998, amended in 1912, 37 Stat. 356; and the following acts of Congress providing for drafting the militia: Feb. 28, 1795, 1 Stat. 424, amended April 18, 1814, 3 Stat. 134; July 17, 1862, 12 Stat. 597.]

Court decisions uniformly have recognized the power. *Tarble's Case,* 13 Wall. 397, 408; *Grimley's Case,* 137 U. S. 147, 153. See also *Presser* v. *Illinois,* 116 U. S. 252, 265; *Robertson* v. *Baldwin,* 165 U. S. 275, 282; *Jacobson* v. *Massachusetts,* 197 U. S. 11, 29; *Butler* v. *Perry,* 240 U. S. 328, 332, 333. In *Kneedler* v. *Lane, supra,* the Conscription Act of 1863, was sustained under the power to raise armies; and in *United States* v. *Scott,* 3 Wall. 642, and *United States* v. *Murphy,* 3 Wall. 649, that act was construed, no question of its constitutionality being raised. Under the similar clause in the Constitution of the Confederacy, draft acts were sustained in the confederate

courts. Compulsory militia service has also been enforced by the courts. *Houston v. Moore*, 5 Wheat. 1; *Martin v. Mott*, 12 Wheat. 19. The Act of 1862, *supra*, requiring performance of militia duty, was sustained in *McCall's Case*, 15 Fed. Cas. No. 8669, p. 1225; *In re Griner*, 16 Wisconsin, 423; *Druecker v. Salomon*, 21 Wisconsin, 621; *In re Spangler*, 11 Michigan, 298; *Allen v. Colby*, 47 N. H. 544. As to the power of the State to draft, see *Lanahan v. Birge*, 30 Connecticut, 438, 443; *People ex rel. German Ins. Co. v. Williams*, 145 Illinois, 573, 583; *In re Dassler*, 35 Kansas, 678, 684; *State v. Wheeler*, 141 N. Car. 773, 777. The present act has been sustained in every case which has come before the federal courts.

There is not, as asserted, any common-law right of a soldier not to be sent out of the country. The status of a citizen properly drafted and that of one who has voluntarily enlisted are the same. Our armies have served in all parts of the world, and such service has never been regarded as illegal. *Fleming v. Page*, 9 How. 603, 615. Numerous statutes of the original States provided that the militia might be sent into neighboring States. Compulsory military service is not contrary to the spirit of democratic institutions, for the Constitution implies equitable distribution of the burdens no less than the privileges of citizenship. Whatever the limitations sought to be set upon the Crown, there can be no doubt that power to impress for foreign service resided in Parliament, and was actually exerted. [The discussion of this subject is supported by many references to history.]

The act infringes no provision of the Constitution concerning the militia. The fact that a citizen is a militiaman does not exempt him from service in the National Army. The militia and the National Army are separate institutions, created for separate purposes; and the power of Congress over the former (Art. I, § 8, cl. 15, 16) is not

in limitation but in extension of the power to raise armies (cl. 12). The law infringes no reserved right of the States over the militia. If there be a conflict between the state and federal powers in this respect, the latter must prevail. *Ex parte Coupland*, 26 Texas, 386, 396, 402; *Burroughs* v. *Peyton*, 16 Gratt. 470, 475, 483–485; *Jeffers* v. *Fair*, 33 Georgia, 347, 351, 353; *Ex parte Tate*, 39 Alabama, 254, 268; *Ex parte Bolling, id.*, 609; *Barber* v. *Irwin*, 34 Georgia, 27, 37; *Simmons* v. *Miller*, 40 Mississippi, 19, 26; *Kneedler* v. *Lane, supra*. Otherwise, the power of Congress to raise armies must be nullified. But there is no conflict in fact. The National Government has never impaired the right of the States to keep up the militia. The present law draws into the National Army but a small portion of the militia as a whole, and the withdrawal from possible call for local service is only temporary. Act of June 15, 1917, § 4, 40 Stat. 217. The right of the States to organize and train the militia remaining has been recognized and safeguarded. Act of June 14, 1917, 40 Stat. 181; National Defense Act of June 3, 1916, § 61, 39 Stat. 198. The restrictions of the militia clause are inapplicable. The draft is not based on liability to perform militia duty, but on liability of citizens to render national military service. When Congress has made provision for calling the militia in the past, the words have been addressed to the militia expressly. [Citing numerous federal acts.] The opposing briefs are in conflict as to whether this act calls the militia. The National Defense Act of 1916, in designating all able-bodied male citizens between the ages of 18 and 45 as militiamen, does not call them to militia service, and clearly does not intend to relinquish the power to call citizens into the National Army. The Draft Act does not call the National Guard in its organized form, but operates upon the individuals, for reorganization in national units. Thus to select the trained members of the

National Guard from the body of citizenship is not arbitrary, but reasonable and prudent. However, even if plaintiffs in error were called as militiamen, they would not be entitled to relief in the courts. *Martin* v. *Mott, supra; Luther* v. *Borden,* 7 How. 1, 44. It is true that the President may not call out the militia for foreign service in time of peace, but in this instance it could not even be said that an emergency had not arisen, or that the President had not wisely exercised his discretion, to repel invasion. 29 Op. Atty. Gen. 322; *Martin* v. *Mott,* 12 Wheat. 29.

The law imposes neither slavery nor involuntary servitude. The Thirteenth Amendment was intended to abolish only the well-known forms of slavery and involuntary servitude akin thereto, and not to destroy the power of the Government to compel a citizen to render public service. *Butler* v. *Perry,* 240 U. S. 328, 332; *Robertson* v. *Baldwin,* 165 U. S. 275, 282; *Clyatt* v. *United States,* 197 U. S. 207, 216; *Edwards* v. *United States,* 103 U. S. 471; *People ex rel. German Ins. Co.* v. *Williams,* 145 Illinois, 573; *Wilson* v. *New,* 243 U. S. 332, 351; *In re Dassler,* 35 Kansas, 678; and other cases. The legislation affecting the Northwest Territory (the language of the Amendment is used in the Ordinance of 1787) shows that compulsory military service was not regarded as involuntary servitude. See Chase, Statutes of Ohio, vol. 1, pp. 92, 102, 113, 211, 245.

The law is not unconstitutional on the ground that state officials aid in its enforcement. The contention that it denies to the States a republican form of government is without merit and a question which the courts will not consider. *Luther* v. *Borden, supra; Pacific Telephone Co.* v. *Oregon,* 223 U. S. 118. As to the objection that it imposes duties on state officials, it is sufficient to say that plaintiffs in error, not being state officials, may not raise the objection. In executing the federal

law state officials are *pro hac vice* federal officials. In the absence of contrary statutory or constitutional provisions of the State, power may be conferred upon state officials as such to execute duties under an act of Congress, as was done during the Civil War in calling out militia.

The law does not delegate legislative authority. It is as specific as is reasonably practicable. Throughout our history the common method of providing for increase in the land forces has been simply to vest authority in the President to raise the necessary troops. [Citing many statutes.]

The act does not infringe the constitutional provisions concerning the judicial power. Art. I, § 8, cl. 9; Art. III, §§ 1, 2. The duties of the boards of exemption are administrative; they determine questions of fact necessary to be ascertained by the Executive in enforcing the law.

The act does not violate the due process clause. It is said that it confers upon the President discretionary and arbitrary powers in the selection of citizens for the draft army and that citizens may be selected upon the whim of a state official. But the act does not require an arbitrary selection. No complaint has been made that it has been arbitrarily or unfairly administered. On the contrary, it provides a fair and orderly method of selection. The individual citizen may incidentally or temporarily be restrained of his liberties in order to protect the liberties of the people as a whole. *Jacobson* v. *Massachusetts,* 197 U. S. 11, 29.

The law neither establishes a religion nor prohibits its free exercise. Section 4 contains nothing respecting the establishment of religion; on the contrary, it goes so far as to aid in the free exercise of those religions which forbid participation in war.

The law does not deprive of the equal protection of the laws. The Fourteenth Amendment is addressed to

the States; and, besides, the exemptions are based on sound classification. The law proceeds upon the equitable principle that each citizen should be subject to call for his particular service. Some are exempted from direct military service because they may help more effectively in other ways. Exemptions were allowed by every compulsory service law passed by the States. Quakers and conscientious objectors were frequently exempted in the Revolutionary War. [Citing many acts of the States.]

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

We are here concerned with some of the provisions of the Act of May 18, 1917, c. 15, 40 Stat. 76, entitled, "An Act to authorize the President to increase temporarily the Military Establishment of the United States." The law, as its opening sentence declares, was intended to supply temporarily the increased military force which was required by the existing emergency, the war then and now flagrant. The clauses we must pass upon and those which will throw light on their significance are briefly summarized:

The act proposed to raise a national army, first, by increasing the regular force to its maximum strength and there maintaining it; second, by incorporating into such army the members of the National Guard and National Guard Reserve already in the service of the United States (Act of Congress of June 3, 1916, c. 134, 39 Stat. 211) and maintaining their organizations to their full strength; third, by giving the President power in his discretion to organize by volunteer enlistment four divisions of infantry; fourth, by subjecting all male citizens between the ages of twenty-one and thirty to duty in the national army for the period of the existing emergency after the proclamation of the President announcing the necessity for their service; and fifth, by providing for

selecting from the body so called, on the further proclama-
tion of the President, 500,000 enlisted men, and a second
body of the same number should the President in his
discretion deem it necessary. To carry out its purposes
the act made it the duty of those liable to the call to
present themselves for registration on the proclamation
of the President so as to subject themselves to the terms
of the act and provided full federal means for carrying
out the selective draft. It gave the President in his dis-
cretion power to create local boards to consider claims
for exemption for physical disability or otherwise made
by those called. The act exempted from subjection to
the draft designated United States and state officials as
well as those already in the military or naval service of
the United States, regular or duly ordained ministers of
religion and theological students under the conditions
provided for, and, while relieving from military service
in the strict sense the members of religious sects as enu-
merated whose tenets excluded the moral right to engage
in war, nevertheless subjected such persons to the per-
formance of service of a non-combatant character to be
defined by the President.

The proclamation of the President calling the persons
designated within the ages described in the statute was
made, and the plaintiffs in error, who were in the class
and under the statute were obliged to present themselves
for registration and subject themselves to the law, failed
to do so and were prosecuted under the statute for the
penalties for which it provided. They all defended by
denying that there had been conferred by the Constitution
upon Congress the power to compel military service by a
selective draft, and asserted that even if such power had
been given by the Constitution to Congress, the terms
of the particular act for various reasons caused it to be
beyond the power and repugnant to the Constitution.
The cases are here for review because of the constitu-

tional questions thus raised, convictions having resulted from instructions of the courts that the legal defences were without merit and that the statute was constitutional.

The possession of authority to enact the statute must be found in the clauses of the Constitution giving Congress power "to declare war; . . . to raise and support armies, but no appropriation of money to that use shall be for a longer term than two years; . . . to make rules for the government and regulation of the land and naval forces." Article I, § 8. And of course the powers conferred by these provisions like all other powers given carry with them as provided by the Constitution the authority "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers." Article I, § 8.

As the mind cannot conceive an army without the men to compose it, on the face of the Constitution the objection that it does not give power to provide for such men would seem to be too frivolous for further notice. It is said, however, that since under the Constitution as originally framed state citizenship was primary and United States citizenship but derivative and dependent thereon, therefore the power conferred upon Congress to raise armies was only coterminous with United States citizenship and could not be exerted so as to cause that citizenship to lose its dependent character and dominate state citizenship. But the proposition simply denies to Congress the power to raise armies which the Constitution gives. That power by the very terms of the Constitution, being delegated, is supreme. Article VI. In truth the contention simply assails the wisdom of the framers of the Constitution in conferring authority on Congress and in not retaining it as it was under the Confederation in the several States. Further it is said, the right to provide is not denied by calling for volunteer enlistments, but it does not and

cannot include the power to exact enforced military duty by the citizen. This however but challenges the existence of all power, for a governmental power which has no sanction to it and which therefore can only be exercised provided the citizen consents to its exertion is in no substantial sense a power. It is argued, however, that although this is abstractly true, it is not concretely so because as compelled military service is repugnant to a free government and in conflict with all the great guarantees of the Constitution as to individual liberty, it must be assumed that the authority to raise armies was intended to be limited to the right to call an army into existence counting alone upon the willingness of the citizen to do his duty in time of public need, that is, in time of war. But the premise of this proposition is so devoid of foundation that it leaves not even a shadow of ground upon which to base the conclusion. Let us see if this is not at once demonstrable. It may not be doubted that the very conception of a just government and its duty to the citizen includes the reciprocal obligation of the citizen to render military service in case of need and the right to compel it. Vattel, Law of Nations, Book III, c. 1 & 2. To do more than state the proposition is absolutely unnecessary in view of the practical illustration afforded by the almost universal legislation to that effect now in force.[1] In England it is certain that before the

---

[1] In the argument of the Government it is stated: "The Statesman's Year-book for 1917 cites the following governments as enforcing military service: Argentine Republic, p. 656; Austria-Hungary, p. 667; Belgium, p. 712; Brazil, p. 738; Bulgaria, p. 747; Bolivia, p. 728; Colombia, p. 790; Chile, p. 754; China, p. 770; Denmark, p. 811; Ecuador, p. 820; France, p. 841; Greece, p. 1001; Germany, p. 914; Guatemala, p. 1009; Honduras, p. 1018; Italy, p. 1036; Japan, p. 1064; Mexico, p. 1090; Montenegro, p. 1098; Netherlands, p. 1119; Nicaragua, p. 1142; Norway, p. 1152; Peru, p. 1191; Portugal, p. 1201; Roumania, p. 1220; Russia, p. 1240; Serbia, p. 1281; Siam, p. 1288; Spain, p. 1300; Switzerland, p. 1337; Salvador, p. 1270; Turkey, p. 1353." See also

Norman Conquest the duty of the great militant body of the citizens was recognized and enforcible. Blackstone, Book I, c. 13. It is unnecessary to follow the long controversy between Crown and Parliament as to the branch of the government in which the power resided, since there never was any doubt that it somewhere resided. So also it is wholly unnecessary to explore the situation for the purpose of fixing the sources whence in England it came to be understood that the citizen or the force organized from the militia as such could not without their consent be compelled to render service in a foreign country, since there is no room to contend that such principle ever rested upon any challenge of the right of Parliament to impose compulsory duty upon the citizen to perform military duty wherever the public exigency exacted, whether at home or abroad. This is exemplified by the present English Service Act.[1]

In the Colonies before the separation from England there cannot be the slightest doubt that the right to enforce military service was unquestioned and that practical effect was given to the power in many cases. Indeed

the recent Canadian conscription act, entitled, "Military Service Act" of August 27, 1917, expressly providing for service abroad (printed in the Congressional Record of September 20, 1917, 55th Cong. Rec., p. 7959); the Conscription Law of the Orange Free State, Law No. 10, 1899, Military Service and Commando Law, sections 10 and 28, Laws of Orange River Colony, 1901, p. 855; of the South African Republic, "De Locale Wetten en Volksraadsbesluiten der Zuid- Afr. Republiek," 1898, Law No. 20, pp. 230, 233, article 6, 28; Constitution, German Empire, April 16, 1871, Art. 57, 59, Dodd, 1 Modern Constitutions, p. 344; Gesetz, betreffend Aenderungen der Wehrpflicht, vom 11 Feb. 1888, No. 1767, Reichs-Gesetzblatt, p. 11, amended by law of July 22, 1913, No. 4264, RGBl., p. 593; Loi sur le recrutement de l'armée of 15 July, 1889 (Duvergier, vol. 89, p. 440), modified by act of 21 March, 1905 (Duvergier, vol. 105, p. 133).

[1] Military Service Act, January 27, 1916, 5 and 6 George V, c. 104, p. 367, amended by the Military Service Act of May 25, 1916, 2nd session, 6 and 7, George V, c. 15, p. 33.

the brief of the Government contains a list of Colonial
acts manifesting the power and its enforcement in more
than two hundred cases. And this exact situation existed
also after the separation. Under the Articles of Confed-
eration it is true Congress had no such power, as its au-
thority was absolutely limited to making calls upon the
States for the military forces needed to create and main-
tain the army, each State being bound for its quota as
called. But it is indisputable that the States in response
to the calls made upon them met the situation when they
deemed it necessary by directing enforced military service
on the part of the citizens. In fact the duty of the citizen
to render military service and the power to compel him
against his consent to do so was expressly sanctioned by
the constitutions of at least nine of the States, an illus-
tration being afforded by the following provision of the
Pennsylvania constitution of 1776. "That every member
of society hath a right to be protected in the enjoyment
of life, liberty and property, and therefore is bound to
contribute his proportion towards the expense of that
protection, and yield his personal service when necessary,
or an equivalent thereto." Art. 8, (Thorpe, American
Charters, Constitutions and Organic Laws, vol. 5, pp.
3081, 3083.) [1] While it is true that the States were some-
times slow in exerting the power in order to fill their
quotas—a condition shown by resolutions of Congress
calling upon them to comply by exerting their compulsory
power to draft and by earnest requests by Washington
to Congress that a demand be made upon the States to

---

[1] See also Constitution of Vermont, 1777, c. 1, Art. 9 (Thorpe, vol. 6,
pp. 4747, 3740); New York, 1777, Art. 40 (id., vol. 5, p. 2637); Mas-
sachusetts Bill of Rights, 1780, Art. 10 (id., vol. 3, p. 1891); New
Hampshire, 1784, pt. 1, Bill of Rights, Art. 12 (id., vol. 4, p. 2455);
Delaware, 1776, Art. 9 (id., vol. 1, pp. 562, 564); Maryland, 1776,
Art. 33 (id., vol. 3, pp. 1686, 1696); Virginia, 1776, Militia (id., vol. 7,
p. 3817); Georgia, 1777, Art. 33, 35 (id., vol. 2, pp. 777, 782).

366. Opinion of the Court.

resort to drafts to fill their quotas [1]—that fact serves to demonstrate instead of to challenge the existence of the authority. A default in exercising a duty may not be resorted to as a reason for denying its existence.

When the Constitution came to be formed it may not be disputed that one of the recognized necessities for its adoption was the want of power in Congress to raise an army and the dependence upon the States for their quotas. In supplying the power it was manifestly intended to give it all and leave none to the States, since besides the delegation to Congress of authority to raise armies the Constitution prohibited the States, without the consent of Congress, from keeping troops in time of peace or engaging in war. Article I, § 10.

To argue that as the state authority over the militia prior to the Constitution embraced every citizen, the right of Congress to raise an army should not be considered as granting authority to compel the citizen's service in the army, is but to express in a different form the denial of the right to call any citizen to the army. Nor is this met by saying that it does not exclude the right of Congress to organize an army by voluntary enlistments, that is, by the consent of the citizens, for if the proposition be true, the right of the citizen to give consent would be controlled by the same prohibition which would deprive Congress of the right to compel unless it can be said that although Congress had not the right to call because of state authority, the citizen had a right to obey the call and set aside state authority if he pleased to do so. And a like conclusion demonstrates the want of foundation for the contention that, although it be within the power to call the citizen into the army without his consent, the army into which he enters after the call is to be limited

[1] Journals of Congress, Ford's ed., Library of Congress, vol. 7, pp. 262, 263; vol. 10, pp. 199, 200; vol. 13, p. 299. 7 Sparks, Writings of Washington, pp. 162, 167, 442, 444.

in some respects to services for which the militia it is
assumed may only be used, since this admits the appro-
priateness of the call to military service in the army and
the power to make it and yet destroys the purpose for
which the call is authorized—the raising of armies to be
under the control of the United States.

The fallacy of the argument results from confounding
the constitutional provisions concerning the militia with
that conferring upon Congress the power to raise armies.
It treats them as one while they are different. This is
the militia clause:

"The Congress shall have power  .  .  .  To provide,
for calling forth the militia to execute the laws of the
Union, suppress insurrections and repel invasions; To
provide for organizing, arming, and disciplining the militia,
and for governing such part of them as may be employed
in the service of the United States, reserving to the States,
respectively, the appointment of the officers, and the
authority of training the militia according to the dis-
cipline prescribed by Congress." Article I, § 8.

The line which separates it from the army power is not
only inherently plainly marked by the text of the two
clauses, but will stand out in bolder relief by considering
the condition before the Constitution was adopted and
the remedy which. it provided for the military situation
with which it dealt. The right on the one hand of Congress
under the Confederation to call on the States for forces
and the duty on the other of the States to furnish when
called, embraced the complete power of government over
the subject. When the two were combined and were
delegated to Congress all governmental power on that
subject was conferred, a result manifested not only by the
grant made but by the limitation expressly put upon the
States on the subject. The army sphere therefore em-
braces such complete authority. But the duty of exerting
the power thus conferred in all its plenitude was not

made at once obligatory but was wisely left to depend upon the discretion of Congress as to the arising of the exigencies which would call it in part or in whole into play. There was left therefore under the sway of the States undelegated the control of the militia to the extent that such control was not taken away by the exercise by Congress of its power to raise armies. This did not diminish the military power or curb the full potentiality of the right to exert it but left an area of authority requiring to be provided for (the militia area) unless and until by the exertion of the military power of Congress that area had been circumscribed or totally disappeared. This, therefore, is what was dealt with by the militia provision. It diminished the occasion for the exertion by Congress of its military power beyond the strict necessities for its exercise by giving the power to Congress to direct the organization and training of the militia (evidently to prepare such militia in the event of the exercise of the army power) although leaving the carrying out of such command to the States. It further conduced to the same result by delegating to Congress the right to call on occasions which were specified for the militia force, thus again obviating the necessity for exercising the army power to the extent of being ready for every conceivable contingency. This purpose is made manifest by the provision preserving the organization of the militia so far as formed when called for such special purposes although subjecting the milita when so called to the paramount authority of the United States. *Tarble's Case*, 13 Wallace, 397, 408. But because under the express regulations the power was given to call for specified purposes without exerting the army power, it cannot follow that the latter power when exerted was not complete to the extent of its exertion and dominant. Because the power of Congress to raise armies was not required to be exerted to its full limit but only as in the discretion of Congress it was deemed the public

interest required, furnishes no ground for supposing that the complete power was lost by its partial exertion. Because, moreover, the power granted to Congress to raise armies in its potentiality was susceptible of narrowing the area over which the militia clause operated, affords no ground for confounding the two areas which were distinct and separate to the end of confusing both the powers and thus weakening or destroying both.

And upon this understanding of the two powers the legislative and executive authority has been exerted from the beginning. From the act of the first session of Congress carrying over the army of the Government under the Confederation to the United States under the Constitution (Act of September 29, 1789, c. 25, 1 Stat. 95) down to 1812 the authority to raise armies was regularly exerted as a distinct and substantive power, the force being raised and recruited by enlistment. Except for one act formulating a plan by which the entire body of citizens (the militia) subject to military duty was to be organized in every State (Act of May 8, 1792, c. 33, 1 Stat. 271) which was never carried into effect, Congress confined itself to providing for the organization of a specified number distributed among the States according to their quota to be trained as directed by Congress and to be called by the President as need might require.[1] When the War of 1812 came the result of these two forces composed the army to be relied upon by Congress to carry on the war. Either because it proved to be weak in numbers or because of insubordination developed among the forces called and manifested by their refusal to cross the border,[2]

---

[1] Act of May 9, 1794, c. 27, 1 Stat. 367; Act of February 28, 1795, c. 36, 1 Stat. 424; Act of June 24, 1797, c. 4, 1 Stat. 522; Act of March 3, 1803, c. 32, 2 Stat. 241; Act of April 18, 1806, c. 32, 2 Stat. 383; Act of March 30, 1808, c. 39, 2 Stat. 478; Act of April 10, 1812, c. 55, 2 Stat. 705.

[2] Upton, Military Policy of the United States, pp. 99 *et seq.*

the Government determined that the exercise of the power to organize an army by compulsory draft was necessary and Mr. Monroe, the Secretary of War, (Mr. Madison being President) in a letter to Congress recommended several plans of legislation on that subject. It suffices to say that by each of them it was proposed that the United States deal directly with the body of citizens subject to military duty and call a designated number out of the population between the ages of 18 and 45 for service in the army. The power which it was recommended be exerted was clearly an unmixed federal power dealing with the subject from the sphere of the authority given to Congress to raise armies and not from the sphere of the right to deal with the militia as such, whether organized or unorganized. A bill was introduced giving effect to the plan. Opposition developed, but we need not stop to consider it because it substantially rested upon the incompatibility of compulsory military service with free government, a subject which from what we have said has been disposed of. Peace came before the bill was enacted.

Down to the Mexican War the legislation exactly portrayed the same condition of mind which we have previously stated. In that war, however, no draft was suggested, because the army created by the United States immediately resulting from the exercise by Congress of its power to raise armies, that organized under its direction from the militia and the volunteer commands which were furnished, proved adequate to carry the war to a successful conclusion.

So the course of legislation from that date to 1861 affords no ground for any other than the same conception of legislative power which we have already stated. In that year when the mutterings of the dread conflict which was to come began to be heard and the Proclamation of the President calling a force into existence was issued it

was addressed to the body organized out of the militia and trained by the States in accordance with the previous acts of Congress. (Proclamation of April 15, 1861, 12 Stat. 1258.) That force being inadequate to meet the situation, an act was passed authorizing the acceptance of 500,000 volunteers by the President to be by him organized into a national army. (Act of July 22, 1861, c. 9, 12 Stat. 268.) This was soon followed by another act increasing the force of the militia to be organized by the States for the purpose of being drawn upon when trained under the direction of Congress (Act of July 29, 1861, c. 25, 12 Stat. 281), the two acts when considered together presenting in the clearest possible form the distinction between the power of Congress to raise armies and its authority under the militia clause. But it soon became manifest that more men were required. As a result the Act of March 3, 1863, c. 75, 12 Stat. 731, was adopted entitled "An Act for enrolling and calling out the National Forces and for other purposes." By that act which was clearly intended to directly exert upon all the citizens of the United States the national power which it had been proposed to exert in 1814 on the recommendation of the then Secretary of War, Mr. Monroe, every male citizen of the United States between the ages of twenty and forty-five was made subject by the direct action of Congress to be called by compulsory draft to service in a national army at such time and in such numbers as the President in his discretion might find necessary. In that act, as in the one of 1814, and in this one, the means by which the act was to be enforced were directly federal and the force to be raised as a result of the draft was therefore typically national as distinct from the call into active service of the militia as such. And under the power thus exerted four separate calls for draft were made by the President and enforced, that of July, 1863, of February and March, 1864, of July and Decem-

ber, 1864, producing a force of about a quarter of a million men.[1] It is undoubted that the men thus raised by draft were treated as subject to direct national authority and were used either in filling the gaps occasioned by the vicissitudes of war in the ranks of the existing national forces or for the purpose of organizing such new units as were deemed to be required. It would be childish to deny the value of the added strength which was thus afforded. Indeed in the official report of the Provost Marshal General, just previously referred to in the margin, reviewing the whole subject it was stated that it was the efficient aid resulting from the forces created by the draft at a very critical moment of the civil strife which obviated a disaster which seemed impending and carried that struggle to a complete and successful conclusion.

Brevity prevents doing more than to call attention to the fact that the organized body of militia within the States as trained by the States under the direction of Congress became known as the National Guard (Act of January 21, 1903, c. 196, 32 Stat. 775; National Defense Act of June 3, 1916, c. 134, 39 Stat. 211). And to make further preparation from among the great body of the citizens, an additional number to be determined by the President was directed to be organized and trained by the States as the National Guard Reserve. (National Defense Act, *supra*.)

Thus sanctioned as is the act before us by the text of the Constitution, and by its significance as read in the light of the fundamental principles with which the subject is concerned, by the power recognized and carried into effect in many civilized countries, by the authority and practice of the colonies before the Revolution, of the States under the Confederation and of the Government

---

[1] Historical Report, Enrollment Branch, Provost Marshal General's Bureau, March 17, 1866.

since the formation of the Constitution, the want of
merit in the contentions that the act in the particulars
which we have been previously called upon to consider
was beyond the constitutional power of Congress, is
manifest. Cogency, however, if possible, is added to the
demonstration by pointing out that in the only case to
which we have been referred where the constitutionality
of the Act of 1863 was contemporaneously challenged
on grounds akin to, if not absolutely identical with, those
here urged, the validity of the act was maintained for
reasons not different from those which control our judg-
ment. (*Kneedler* v. *Lane*, 45 Pa. St. 238.) And as further
evidence that the conclusion we reach is but the inevit-
able consequence of the provisions of the Constitution
as effect follows cause, we briefly recur to events in another
environment. The seceding States wrote into the con-
stitution which was adopted to regulate the government
which they sought to establish, in identical words the
provisions of the Constitution of the United States which
we here have under consideration. And when the right
to enforce under that instrument a selective draft law
which was enacted, not differing in principle from the
one here in question, was challenged, its validity was up-
held, evidently after great consideration, by the courts
of Virginia, of Georgia, of Texas, of Alabama, of Mis-
sissippi and of North Carolina, the opinions in some of
the cases copiously and critically reviewing the whole
grounds which we have stated. *Burroughs* v. *Peyton*,
16 Gratt. 470; *Jeffers* v. *Fair*, 33 Georgia, 347; *Daly and
Fitzgerald* v. *Harris*, 33 Ga. (Supp.) 38, 54; *Barber* v.
*Irwin*, 34 Georgia, 27; *Parker* v. *Kaughman*, 34 Georgia,
136; *Ex parte Coupland*, 26 Texas, 386; *Ex parte Hill*,
38 Alabama, 429; *In re Emerson*, 39 Alabama, 437; *In re
Pille*, 39 Alabama, 459; *Simmons* v. *Miller*, 40 Mississippi,
19; *Gatlin* v. *Walton*, 60 N. Car. 333, 408.

In reviewing the subject, we have hitherto considered

it as it has been argued, from the point of view of the Constitution as it stood prior to the adoption of the Fourteenth Amendment. But to avoid all misapprehension we briefly direct attention to that Amendment for the purpose of pointing out, as has been frequently done in the past,[1] how completely it broadened the national scope of the Government under the Constitution by causing citizenship of the United States to be paramount and dominant instead of being subordinate and derivative, and therefore, operating as it does upon all the powers conferred by the Constitution, leaves no possible support for the contentions made, if their want of merit was otherwise not so clearly made manifest.

It remains only to consider contentions which, while not disputing power, challenge the act because of the repugnancy to the Constitution supposed to result from some of its provisions. First, we are of opinion that the contention that the act is void as a delegation of federal power to state officials because of some of its administrative features, is too wanting in merit to require further notice. Second, we think that the contention that the statute is void because vesting administrative officers with legislative discretion has been so completely adversely settled as to require reference only to some of the decided cases. *Field* v. *Clark*, 143 U. S. 649; *Buttfield* v. *Stranahan*, 192 U. S. 470; *Intermountain Rate Cases*, 234 U. S. 476; *First National Bank* v. *Union Trust Co.*, 244 U. S. 416. A like conclusion also adversely disposes of a similar claim concerning the conferring of judicial power. *Buttfield* v. *Stranahan*, 192 U. S. 470, 497; *West* v. *Hitchcock*, 205 U. S. 80; *Oceanic Steam Navigation Co.* v. *Stranahan*, 214 U. S. 320, 338–340; *Zakonaite* v. *Wolf*, 226 U. S. 272, 275. And we pass without anything but statement

---

[1] *Slaughter House Cases*, 16 Wall. 36, 72–74, 94–95, 112–113; *United States* v. *Cruikshank*, 92 U. S. 542, 549; *Boyd* v. *Thayer*, 143 U. S. 135, 140; *McPherson* v. *Blacker*, 146 U. S. 1, 37.

the proposition that an establishment of a religion or an interference with the free exercise thereof repugnant to the First Amendment resulted from the exemption clauses of the act to which we at the outset referred, because we think its unsoundness is too apparent to require us to do more.

Finally, as we are unable to conceive upon what theory the exaction by government from the citizen of the performance of his supreme and noble duty of contributing to the defense of the rights and honor of the nation, as the result of a war declared by the great representative body of the people, can be said to be the imposition of involuntary servitude in violation of the prohibitions of the Thirteenth Amendment, we are constrained to the conclusion that the contention to that effect is refuted by its mere statement.

*Affirmed.*