## PRICE v. UNITED STATES.

### No. 49681.

United States Court of Claims.
Oct. 2, 1951.

Samuel T. Ansell, Washington, D. C., for plaintiff. Ansell & Ansell, Washington, D. C., were on the briefs.

Thomas O. Fleming, Washington, D. C., with whom was Asst. Atty. Gen. Holmes Baldridge, for defendant. Wilson Myers, Washington, D. C., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

JONES, Chief Judge.

On June 29, 1948, was enacted the Army and Air Force Vitalization and Retirement Equalization Act, 62 Stat. 1081, Section 302(a), 10 U.S.C.A. § 1036a(a), of that act provides as follows: "Any person who, upon attaining or having attained the age of sixty years, has performed satisfactory Federal service as defined in this section in the status of a commissioned officer * * * in the Army of the United States * * *, including the respective reserve components thereof, and also including the federally recognized National Guard prior to 1933 * * *, and has completed an aggregate of twenty or more years of such satisfactory service in any or all of the aforesaid services, shall, upon application therefor, be granted retired pay * * *."

Plaintiff Price, a member of the Pennsylvania National Guard from 1886 until his retirement in the rank of Major General in 1933, applied for, and was denied, retired pay under this statute. Retired pay was denied on the ground that National Guard service prior to passage of the National Defense Act of 1916, 39 Stat. 166, was not "Federal service" within the meaning of the 1948 act.

It will be noted that it is prescribed in the above-quoted Section 302(a) of the 1948 act that "Federal service" shall include service in the "federally recognized National Guard prior to 1933". Section 306(a), 10 U.S.C.A. § 1036e(a) provides that "Federal service" shall be deemed to include all active Federal service and all service in a reserve component. And Section 306(c) provides that service in a reserve component shall consist of service in the following orgainizations, *inter alia*, and shall be deemed to be Federal service for the purposes of the act:

"(1) the National Guard of the United States;

"(2) the National Guard while in the service of the United States;

"(3) the federally recognized National Guard prior to 1933;

"(4) a federally recognized status in the National Guard prior to 1933."

Plaintiff contends that his National Guard service subsequent to passage of the Dick Act of 1903, 32 Stat. 775, was federally recognized National Guard service and counts for purposes of retirement under the 1948 act.

The Dick Act of 1903 was entitled "An Act To promote the efficiency of the militia, and for other purposes." Its pertinent provisions can be summarized as follows:

All the militia sections of the Revised Statutes except R.S. § 1661, which provided for an annual militia appropriation of $1,000,000, were repealed. The militia was declared to consist of all able-bodied male citizens between eighteen and forty-five. The militia was divided into two classes, the organized militia and the Reserve Militia. The organized militia was to consist of the regularly enlisted, organized, and active militia of the several States, that is, of their National Guard organizations. The President was empowered to call the militia into the service of the United States for periods of not exceeding nine months for the Constitutional purposes, see Constitution, Article I, Section 8, of repelling invasion, suppressing insurrection, and executing the laws of the United States. By 1908 the organization, armament, and discipline of the organized militia was to be the same as that prescribed for the Regular and Volunteer Armies of the United States. The President was empowered in time of peace to fix the minimum number of enlisted men in each organized militia unit. There was to be appointed in each State an Adjutant General who was to make returns to the Secretary of War of the strength of the organized militia and make such other reports as the Secretary might require. The Secretary was authorized to issue arms and equipment to the organized militia of a State on the requisition of the Governor without charging the cost to the State's allotment of the annual appropriation provided for in R.S. § 1661.

The Secretary of War was to have each State's organized militia inspected once a year. If it appeared from the inspection report that the organized militia was sufficiently armed, uniformed, and equipped for active duty in the field, the Secretary was authorized to pay out, on the requisition of the Governor, so much of the State's allotment under R.S. § 1661 as should be necessary for the payment, subsistence and transportation of such portion of the State's organized militia as should engage in actual field or camp service for instruction. The officers and men while so engaged were to get the same pay and allowances as men in the Regular Army. The Secretary was authorized to provide at the request of the Governor for participation of any State's organized militia in Regular Army encampments, maneuvers, and field instructions, in which case the organized militia was to receive out of Army appropriations the same pay as members of the Regular Army. Organized militia officers could upon recommendation of their Governors attend military schools and colleges; while doing so, they would receive out of Army appropriations the pay of Regular Army officers. The annual appropriation provided for by R.S. § 1661 was made available for providing for issuing to the organized militia any supplies, stores, and publications supplied to the Army by any department.

During the year preceding each allotment of funds under R.S. § 1661 each State furnished with material of war under this or previous acts of Congress was to require each organized militia unit not excused by the Governor to participate in practice marches or go into camp of instruction at least five consecutive days and to assemble for drill and instruction or target practice at least twenty-four times; also each State was to have each militia unit inspected during the year by an officer of the militia or of the Regular Army. The Secretary of War was authorized on the application of the Governor of a State which had been furnished material of war under this or former acts of Congress to detail an Army officer to attend militia encampments to give instruction. Furthermore, he could on the application of a Governor detail officers to report to the Governor for duty with the State's organized militia; such assignments could be revoked at the request of the Governor or at the pleasure of the Secretary. A militiaman disabled in the service of the United States was entitled to the benefits of the pension laws. Provision was made for qualifying organized militia officers and men for commissions in any volunteer force which might later be raised.

This was significant legislation. It "represented a marked forward step; indeed, this measure was the first real exercise of the long dormant Congressional power to organize the militia." Wiener, The Militia Clause of the Constitution, 54 Harv.L.Rev. 181, 195 (1940). It was amended in 1908 by the second Dick Act, 35 Stat. 399, the most significant provisions of which removed the nine-month limitation on the period for which the President could call forth the militia into the service of the United States and provided that when so called forth the militia could serve either within or without the territory of the United States. There were doubts as to the constitutionality of this latter provision, and in 1912 Attorney General Wickersham gave his opinion to the Secretary of War that the organized militia, when called into the service of the United States, could be used only for the specified Constitutional purposes of suppressing insurrections, repelling invasions, and executing the laws of the Union. The Attorney General answered in the negative the question: "Whether or not, under existing laws, the President has authority to call forth the organized militia of the States and send it into a foreign country with the Regular Army as a part of an army of occupation, especially should the United States intervene in the affairs of such country under conditions short of actual welfare?" 29 Op.Atty.Gen. 322 (1912).

When the 1903 act became a law the National Guard officials thought their long fight for full recognition at last had been won.

But the ruling of the Attorney General had cast a shadow of uncertainty. If he were correct in his analysis, what had seemed a shining accomplishment was but a gleam in the sorcery of human events. What they had considered a living reality had become a ghost walking slowly through the corridors of Congressional history.

Many people disagreed with the Attorney General.

This situation was unsatisfactory; a military force that could not except in the most unusual situations be used outside the national boundaries was not well adapted to the needs of the twentieth century. Various proposals were made and discussed in and out of Congress. See Wiener, op. cit., pages 196–199. The culmination was the National Defense Act of 1916, 39 Stat. 166.

The outstanding contribution of the National Defense Act of 1916 was contained in section 111 of the act. When Congress authorized the use of armed land forces in excess of those in the Regular Army, the President was empowered to "draft into the military service of the United States" any or all members of the National Guard or National Guard Reserve. "All persons so drafted shall, from the date of their draft, stand discharged from the militia, and shall from said date be subject to such laws and regulations for the government of the Army of the United States as may be applicable to members of the Volunteer Army, * * *." 39 Stat. 211. By acting under the power to raise armies the Congress provided for using the militia, not as militia but as drafted soldiers, anywhere for any purposes.

Our problem is whether the 1916 act or the 1903 act first "federally recognized" the National Guard.

The Militia Bureau[1] was established by the act of 1916; it replaced the National Militia Board created by the 1908 act.

From the time of the passage of the Dick Act in 1903 the Federal authorities had an effective means of enforcing Federal regulation of the arming and training of the National Guard. Nonconforming States could be deprived of participation in the annual militia appropriation. See, for example, War Department Annual Reports, 1909 (Vol. 1), Report of the Secretary of War, page 60:

"The new law provides that after the 21st of January, 1910, in order to be

---

[1.] Its name was charged to National Guard Bureau by the 1933 act, infra, 48 Stat. 153, 159.

classified as 'organized militia,' and thereby enjoy the benefits of the funds appropriated by the Congress and of the issues made pursuant to law, all state forces must have the same organization, armament, and discipline as the Regular Army. After that date, therefore, it will be incumbent upon the department to note what departures, if any, are to be found among the state troops from the standard imposed by the law. The limiting date was made originally January 21, 1908, but in view of the fact that some of the States had not found it possible to reorganize their forces and to conform to the requirements of the law in respect to organization, armament, and discipline, the date was extended two years. During the past year the military authorities and legislatures of the States have been actively engaged in endeavoring to meet the requirements of the law in regard to conformity with Regular Army standards. It may be said that conformity has been satisfactorily established in all but two States. It is the understanding of the department, from correspondence, that all of the States will, prior to the date specified, pass laws which will accomplish the conformity between their forces and those of the United States enjoined by the new law.

"It has been necessary to indicate to the state authorities that the law requires not only that there shall be conformity as to organization and as to armament and equipment of their forces, but that the *discipline* of the organized militia shall be the same as that of the Regular Army, the word 'discipline,' as used in the Constitution and the law being construed to mean that instruction and drill that may be necessary to give troops a real military value for field service after they shall have been organized and equipped. The object of the constitutional provisions and the laws enacted thereunder is, clearly, that when the organized militia shall have been called to the service of the United States they shall not only be organized and equipped like the regular forces, but that they shall have the same training and drill and possess that degree of military discipline which will enable them to be combined in a homogeneous way with the regular forces in the larger brigade, division, and corps units. In one or two cases it has been necessary to point out, as a result of the inspections made by officers of the Regular Army, that unless the standard of instruction and discipline of certain organizations is improved prior to January 21 next it will be necessary for the department to have special inspections made with a view to ascertaining whether the organizations in question have that degree of discipline, instruction, and training to make them worthy of being classified as 'organized militia.'"

See also War Department Annual Reports, 1910 (Vol. 1), Report of the Secretary of War, pages 48–51.

And in McChesney, National Defense, Constitutionality of Pending Legislation, 64 U. of Pa.L.Rev. 449, 461 (1916): "The Secretary of War has recently strikingly exercised this power [to regulate the militia] and by Executive Order has promulgated rules and regulations for the organizing, arming, and disciplining the militia, claiming the right under the powers conferred upon him through certain legislation by Congress under this grant of power, and such regulations have been carried into effect, though contrary to state statutes and in violation of state regulations. And notwithstanding this, the states have accepted them and have been compelled to accept them if they desired to participate in federal allotment to militia. * * * This indicates how far the government might go toward federalizing the militia even under present inadequate legislation, if it makes up its mind to depend upon it and to exercise its power to its fullest extent."

This is not different in kind from the sanction provided for in the 1916 act. Section 116 of that act was as follows, 39 Stat. 212, 32 U.S.C.A. § 24: "Sec. 116. Noncompliance with Federal Act.—Whenever any State shall, within a limit of time to be fixed by the President, have failed or refused to comply with or enforce any requirement of this Act, or any regulation promulgated thereunder and in aid thereof by the President or the Secretary of War,

the National Guard of such State shall be debarred, wholly or in part, as the President may direct, from receiving from the United States any pecuniary or other aid, benefit, or privilege authorized or provided by this Act or any other law."

The fact that the 1903 Dick Act required the organized militia to conform to Federal specifications in their arming, training, and discipline is, we think, a strong argument for the proposition that that act "recognized" the organized militia. In fact, Secretary Root in recommending the proposed legislation had stated that "The fundamental idea of the bill is to recognize the value of the National Guard."

The Pay Readjustment Act of 1942, 56 Stat. 359, provided that in computing service for pay purposes credit should be given for 75 percent of the time during which officers held commissions "as officers of the Organized Militia between January 21, 1903, and July 1, 1916, or of the National Guard * * * since June 3, 1916." This act was later amended, 56 Stat. 1037, to give full time for service in the "Organized Militia prior to July 1, 1916, or in the National Guard * * *."

The struggle between local control and centralized authority in government is as old as history. It is difficult to maintain a stable, free country without a large measure of local control. That was the pattern on which this country has grown from simple beginnings to the heritage of freedom and power. History furnishes few if any illustrations of a highly centralized government in which, over a long period of time, any great measure of freedom of action was permitted to the individual citizen.

The ragged Continentals who fought and won their liberty against the centralized and disciplined British army were state organized and furnished by the respective colonies. They were individualists. There is in the citizen soldier, after he has been thoroughly trained by a competent national officer, an indefinable quality not always found in the professional soldier.

When their representatives wrote the Constitution they recognized the need of local militia. They believed that the real strength of the country came from the grass roots. Their primary fear was that a strong national government would absorb the State governments and with it the rights of the people.

There have been long and repeated efforts on the part of some of the military to practically do away with the National Guard and the State militia or to make them part and parcel of the Regular Army.

This has been resisted by the representatives of the people in the Congress. These conflicting viewpoints have resulted in a blending and gradual federalizing of the National Guard. From the beginning it was realized that in an emergency the militia should be subject to national call. By the terms of Section 8 of Article I of the Constitution Congress is given authority—

"To raise and support Armies * * *;
* * * * * *

"To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions;

"To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress."

█ There can be no doubt of the power of Congress to federalize the National Guard or any part of it. Selective Draft Law Cases, (Arver v. U. S.), 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349.

The question to be decided is whether, within the meaning of the 1948 act, plaintiff's service in the so-called National Guard prior to 1916 was "federally recognized." Defendant contends that in the sense used in the 1948 act, there was no federal recognition of the National Guard prior to 1916. This contention, we think, is based on an extremely narrow and arbitrary concept of the term "federally recognized." The Dick Act of 1903 extended Federal control over the organized State militia. It set up cer-

tain standards of training, service and discipline, and made compliance with these standards a prerequisite to the receipt of federal funds. It made units so complying subject to call by the President of the United States for a maximum of nine months of Federal service. While it did not empower the President to use the Guard for all purposes authorized by the Constitution respecting the use of the Federal army, it did authorize its use for certain of those purposes. This act represented a large measure of Federal control and granted in return for submission to and compliance with such control, certain privileges. We cannot see how this sort of control can be exercised by the Federal Government without the legislation authorizing such control constituting a degree of recognition. Webster's Dictionary defines the word "recognize," *inter alia*, "to acknowledge by admitting to a privileged status."

In 1908 the Dick Act was amended to empower the President to require a further constitutional service of the Guard, i. e., sending it abroad in the service of the country. Because there was some doubt as to the constitutionality of the provision as passed, the National Defense Act of 1916 contained provisions to effectuate that purpose within the framework of the Constitution. That act further extended the Federal control over the organized militia or National Guard, granting greater privileges in return for wider duties on the part of the Guard. Of special interest in considering the status of service in the Guard prior to the passage of that act are sections 70 through 73.

"Sec. 70. Federal enlistment contract.— Enlisted men in the National Guard of the several States, Territories, and the District of Columbia now serving under enlistment contracts which contain an obligation to defend the Constitution of the United States and to obey the orders of the President of the United States shall be recognized as members of the National Guard under the provisions of this Act for the unexpired portion of their present enlistment contracts. When any such enlistment contract does not contain such obligation, the en-

listed man shall not be recognized as a member of the National Guard until he shall have signed an enlistment contract and taken and subscribed to the following oath of enlistment, upon signing which *credit shall be given for the period already served under the old enlistment contract:* * * *. [Italics supplied.]

"Sec. 73. Federal oath for National Guard officers.—Commissioned officers of the National Guard of the several States, Territories, and the District of Columbia now serving under commissions regularly issued shall continue in office, as officers of the National Guard, without the issuance of new commissions: *Provided,* That said officers *have taken,* or shall take and subscribe to the following oath of office: * *. [Italics supplied, except for "Provided."]

The above provisions specifically recognize prior service in certain branches of the Guard with respect to enlisted men and officers, for the purposes of computing the time served under enlistment contracts and determining the necessity of issuing new commissions to officers. It is true that the recognition thus provided for was not for the purpose of computing years of service for retirement pay but at that time no retirement pay for Guardsmen was contemplated or provided for.

We have no doubt that the term "federally recognized" took on certain specific meanings subsequent to the passage of the 1916 act and it may well be that at the time of the passage of the 1948 act the War Department applied it only to service in the Guard subsequent to the passage of the 1916 National Defense Act for the purpose of computing retired pay. There is no doubt in our minds that the term had no such meaning in 1916 since retired pay was not then under consideration. If Congress, in defining Federal service in section 306 (c) had intended to limit such service to Guard service recognized since 1916, it could easily have said so. Instead, it said "the federally recognized National Guard prior to 1933". Upon compliance with the terms of the Dick Act, certain Guard service received Federal recognition in 1903. That recognition was specifically

confirmed in 1916 and plaintiffs in the suits before us all performed services prior to 1916 (and after) that complied with the requirements for Federal recognition under the Dick Act and the act of 1916.

■ The 1916 act was more than a recognition. It was a temporary absorption of the units that were taken. In order to avoid any possible constitutional question as to their use beyond continental borders, the act did not stop with recognition. It ripped the sack wide open, lifted the strands of the National Guard bodily and wove the component threads into the warp and woof of the Regular Army. For the period of such use they were no longer National Guard units, but an integral part of the Army of the United States.

We find nothing in the legislative history of the 1903, 1916, or the 1948 acts, of which we may validly take cognizance, which persuades us that Congress meant other than what it said in section 306 (c) (3) or (4).

Since 1886 the plaintiff had been a member of the National Guard. He is 82 years old. He has always responded to his country's call. In three different wars he has been a member of fighting units. He and the few others who are involved are fast approaching the purple stage and tinted glow of the sundown. A consistent and literal interpretation of the three acts results in a reasonable disposition of the controversy at least in so far as plaintiff is concerned. From the history, background, and development of this legislation we are convinced that the Congress intended that a soldier with his record of service should be included.

[3] We hold that plaintiff may include the Guard service recognized by the Federal Government under the 1903 and 1916 acts in computing his years of service for the purposes of retired pay under the 1948 act, to become effective as of the date of filing of the application. To hold otherwise it would be necessary to construe either clause (3) or clause (4) of section 306 (c) of the act of June 29, 1948, as being meaningless.

Entry of judgment is suspended pending receipt of a report from the General Accounting Office showing the amount due plaintiff in accordance with the foregoing opinion.

HOWELL, WHITAKER, and LITTLETON, Judges, concur.

MADDEN, Judge (dissenting).

As I see it, our problem is not to ascertain the dictionary meaning of the expression "the federally recognized National Guard prior to 1933." It is to find the statutory meaning. The words, without any setting, might have any one of a number of different meanings. But as Congress used them, they must have been intended to have a certain meaning, because important consequences to the Government and to individuals were to flow from them. I think it is quite clear that, as used, the words referred to a process that could not have occurred prior to the adoption of the National Defense Act of 1916. That Act, in its Section 74, first used the word "recognition" and used it as describing a procedure which could only take place in the future, because it required the taking of an oath which was prescribed by that very Act. The National Guard Regulations, issued by the Secretary of War in 1919, in its Title E, contained the heading "Organization of New Units and Procedure Governing the Extending of Federal Recognition Thereto." Section 145 of Title E refers expressly to units "recognized by the War Department as National Guard under the provisions of the Act of Congress of June 3, 1916." Section 147 refers to troops which "have specifically qualified for, and have received, recognition as National Guard by the War Department." Section 148 is as follows: " 'Federal recognition' is defined as the acceptance by the Federal Government as National Guard, of officers or a body of enrolled officers and men who have complied with the provisions of the Act of June 3, 1916 and who are entitled to the benefits of the act." Sections 149, 150, 152, 153 (d), 153 (f), and Paragraph 95, as modified by Changes No. 1, all use the expression "Federal recognition," referring to a procedure taking place pursuant to the 1916 Act.

318

The Act of June 15, 1933, was an amendment to the National Defense Act of 1916. When it used the expression "federally recognized" as applicable to the National Guard, it must have done so with the meaning which the 1916 Act, and the Regulations issued thereunder, attributed to it. Thus, by what seems to me to be a peculiarly clear chain of descent, an expression which, taken by itself, would be unclear, acquires a clear statutory meaning. With that meaning there was not, and could not have been any "federally recognized National Guard" prior to 1916 because in that year, for the first time, did Congress define and authorize the taking of the steps leading to "recognition."