# Authority to Establish System of Universal Military Training

If Congress enacts legislation along the lines of either of two proposals for the establishment of a system of universal military training, supported by appropriate declarations of policy and findings of fact, such legislation would be well within the constitutional powers of the federal government.

May 22, 1947

LETTER OPINION FOR THE CHAIRMAN
ADVISORY COMMISSION ON UNIVERSAL TRAINING

You have submitted to me two proposals for the establishment of a system of universal training in this country, one prepared by the War Department, embodying the so-called "Army Plan for Universal Military Training"; the second prepared by the American Legion, embodying the features of the so-called "Legion Plan."

You say, in general: "The Commission itself has as yet come to no conclusion on the question of whether a universal military training program should or should not be adopted or as to the precise form such training should take if any program is favored." You add, regarding the Army proposal: "The War Department emphasized to me that this draft is in a constant state of revision as to detail and that it should not be considered as in anywise a finished product"; and regarding the Legion proposal: "Legion officials have also emphasized that their draft is not as yet ready for submission to the Congress."

You ask my opinion "whether the enactment of either of these bills is within the constitutional authority of the Federal Government." You suggest also that in the event I conclude that either or any part of these bills could not be legally enacted by the Congress, I indicate my views "as to what constitutional amendment or amendments would be required in order to place the authority to enact such legislation in the Federal Government."

## I.

The two proposals, to which I shall refer, respectively, as the "Army bill" and the "Legion bill," resemble each other closely both as to purpose and scope. The Army bill, if enacted, would create a Universal Military Training Corps, into which the young men of the nation, within certain age groups, would be inducted, on a compulsory basis, to be trained in the arts of war for a twelve-month period by the personnel and under the direction of the Armed Forces of the United States. The Legion bill has a similar general design. It would create a corps, under the name of National Security Training Corps, into which induction is also to be compulsory, its membership likewise to undergo "military or related training" by armed forces personnel. Those subject to induction, in each case, would be male

citizens and non-citizens between the ages of seventeen and twenty. The periods of training differ, but not substantially. Under both proposals, trainees are permitted options and alternatives as to training.

Each proposal visualizes a nationwide system of local boards, approximately on the pattern utilized in World Wars I and II. The Army bill specifically charges the system established by the President under authority of the Selective Training and Service Act of 1940 (Pub. L. No. 76-783, 54 Stat. 885) with "(1) the registration, classification, selection and delivery of registrants to the armed forces for training, (2) maintaining a current inventory of the manpower resources of the nation, and (3) such other duties and functions as may be required under authority of this Act." The Legion bill would achieve essentially the same results through the creation of a civilian commission which, among other duties, would "establish in each county, or comparable political subdivision . . . one or more local boards . . . to make determinations with respect to the rights, privileges and obligations of individuals under this Act"; to "call and register"; and to "keep current information with respect to the registration status and training status, of all individuals residing within their respective jurisdictions who are required to undergo training."

The Army and Legion bills, equally, though with differences as to detail, include provision for hospitalization, surgical, medical and dental services; insurance and dependency allowances; and a small monthly "compensation." Each bill makes special provisions for conscientious objectors. Each provides substantial penalties for failure to comply with its requirements.

In these aspects, the two proposals resemble closely the patterns of the Selective Draft Act of 1917 (Pub. L. No. 65-12, 40 Stat. 76) and the Selective Training and Service Act of 1940 (Pub. L. No. 76-783, 54 Stat. 885). In other respects, however, the two bills diverge from the earlier patterns. The trainees are not available for combat service. And, unlike the situation in the past, when drafted men became an integral part of the Army once they were inducted and accepted (section 1 of the National Defense Act of 1916, Pub. L. No. 64-85, § 1, 39 Stat. 166, 166, as amended by section 3 of the Act of December 13, 1941, Pub. L. No. 77-338, § 3, 55 Stat. 799, 800, *codified at* 10 U.S.C. § 2; *cf. Patterson v. Lamb*, 329 U.S. 539 (1947)), the trainees under these bills would not become full-fledged members of the Army or Navy, though in some respects they would have like rights and obligations.

Thus, the Army bill provides for "training for duty with the Armed Forces of the United States" and adds that "upon successful completion of one full year's training in the Corps or the equivalent of one year's training as provided in Section 101 of this Act, trainees will not be subject to further compulsory military training or service, but will revert to full civilian status, and as such are liable to call for further training or service as members of the armed forces only during a national emergency expressly declared by Congress or by the President." "Trainees," the bill provides, "shall be inducted . . . only for training."

The Legion bill provides for a National Security Training Corps, to be composed of individuals "undergoing military or related training under this Act otherwise than as (a) members of the Regular Military or Naval Establishment or any of the reserve components thereof, (b) the Reserve Officers Training Corps, or (c) Cadets at the United States Military Academy, Coast Guard Academy, or Merchant Marine Academies, or midshipmen at the United States Naval Academy." "Every individual who undergoes training under this Act and, in the judgment of those in authority over him, satisfactorily completes such training shall be entitled to a certificate to that effect, which shall include a record of any special proficiency or merit attained."

## II.

The constitutionality of either of the above programs if enacted into law by the Congress is best tested by an examination of the selective draft and selective training and service legislation of World Wars I and II. The pertinent provisions of the Constitution lie in Section 8 of Article I:

> The Congress shall have Power To . . . provide for the common Defence and general Welfare of the United States; . . .

> To declare War . . . ;

> To raise and support Armies, but no Appropriation of Money to that Use shall be for a longer Term than two Years;

> To provide and maintain a Navy;

> To make Rules for the Government and Regulation of the land and naval Forces; . . .

> To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers . . . .

That these enumerated powers were ample to sustain the Selective Draft Act of 1917 was definitely and firmly established in the *Selective Draft Law Cases*, 245 U.S. 366 (1918). There the constitutionality of the statute, which was attacked from every standpoint, was sustained by a unanimous Supreme Court. The opinion is too long even to be summarized, but it is rested, basically, on the congressional power to raise and support armies; and it is significant that Chief Justice White, who spoke for the Court, said:

> It may not be doubted that the very conception of a just government and its duty to the citizen includes the reciprocal obligation of the

> citizen to render military service in case of need and the right to compel it.

*Id.* at 378.

So comprehensive and powerful was the opinion in the *Selective Draft Law Cases* that when Congress enacted the Selective Training and Service Act of 1940 more than 14 months prior to the entry of the United States into World War II, the only new point which it was possible to raise was the circumstance that this second act had been passed when the United States was at peace. The argument against the statute was that Congress lacked power to draft the nation's manpower for military training and service prior to an actual declaration of war.

That contention was consistently rejected by the courts. The constitutionality of the Selective Training and Service Act of 1940, as applied prior to and after the declaration of war, was sustained in every federal court that passed upon it. *See United States v. Lambert*, 123 F.2d 395 (3d Cir. 1941); *United States v. Herling*, 120 F.2d 236 (2d Cir. 1941) (per curiam); *United States v. Rappeport*, 36 F. Supp. 915 (S.D.N.Y. 1941); *Stone v. Christensen*, 36 F. Supp. 739 (D. Or. 1940); *United States v. Cornell*, 36 F. Supp. 81 (D. Idaho 1940); *United States v. Garst*, 39 F. Supp. 367 (E.D. Pa. 1941).

The Court of Appeals for the Third Circuit in *Lambert* flatly answered the contention that Congress could not provide measures of manpower mobilization in time of peace. The court said:

> The power granted to Congress by the Constitution to "provide for the common Defence" and "to raise and support Armies" is not to be interpreted in a way which will make the power ineffective against an enemy, actual or potential. We are not precluded from preparing for battle, if battle must come, until such time as our preparation would be too late.

123 F.2d at 396.

While the precise question was never passed upon by the Supreme Court, the opinion in the *Selective Draft Law Cases* and the language of the Court in discussing that decision and in dealing generally with the war power make it perfectly clear that the power of Congress to raise armies by selective draft even prior to the declaration of war cannot be successfully challenged. *See, e.g.*, *N. Pac. Ry. Co. v. North Dakota*, 250 U.S. 135, 149–50 (1919); *United States v. Williams*, 302 U.S. 46, 48 (1937); *United States v. Bethlehem Steel Corp.*, 315 U.S. 289, 305 (1942); *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 n.19 (1943); *Hirabayashi v. United States*, 320 U.S. 81, 93 (1943). It is significant, in my judgment, that no litigant in any case heard on the merits in the Supreme Court ever questioned the pre-Pearl Harbor application of the 1940 Selective Service Act.

## III.

Is, then, the plan, as embodied either in the Army bill or the Legion bill, sufficiently close, in type and purpose, to those embodied in the Acts of 1917 and 1940, and would the circumstances of enactment be deemed sufficiently similar, to warrant the conclusion that such legislation would be constitutional? I have no doubt these questions should be answered in the affirmative.

I wish to point, first of all, to the contemplated legislative findings.

The Army bill provides:

> That (a) Congress hereby declares that in keeping with the fundamental objective to provide for the common defense expressed in the preamble to the Constitution of the United States, and in order to assure the peace and security of future generations, it is a sound and democratic principle that each physically and mentally fit male citizen and alien residing in the United States, owes an obligation to this country to undergo military training which will fit him to protect it in an emergency; That adequate preparedness will prevent aggressive wars against this country and the needless sacrifice of human life; That a well trained citizenry is the keystone of preparedness, and that such preparedness can best be assured through a system of military training for the youth of the nation; That it is essential to maintain an alert and trained citizenry capable of prompt mobilization to meet and deal with any national emergency as is declared by the Congress.

> (b) That Congress further declares that in a free society the obligations and privileges of military training should be shared universally in accordance with a fair and just system of selection.

In the Legion bill,

> Congress hereby declares

> (1) That to provide the common defense for which the Constitution of the United States was ordained and established every male citizen of the United States and every other male person residing in the United States owes to our country an obligation to undergo training which will fit him to contribute to its protection in time of emergency;

> (2) That adequate preparedness will prevent wars against this country and the needless sacrifice of human life; and

(3) That a citizenry trained for defense is the bulwark of democracy and the keystone of preparedness and can best be assured through youth training for national security.

The design under both the Army bill and the Legion bill falls short of the full system of induction and training embodied in legislation previously upheld by the courts. This does not operate to invalidate either proposal. The Supreme Court, in the *Selective Draft Law Cases*, made it clear that "[b]ecause the power of Congress to raise armies was not required to be exerted to its full limit but only as in the discretion of Congress it was deemed the public interest required, furnishes no ground for supposing that the complete power was lost by its partial exertion." 245 U.S. at 383–84.

The events of the past decade have amply demonstrated that it is too late to improvise armies when war starts or is declared—the latter generally after the attack has started and the enemy invasion is well under way. And the latest scientific developments foreshadow a time when an even shorter period of grace will be available to nations whose peaceable intentions and limitless resources invite aggressive action from without. Chief Justice Hughes has pointed out that the war power of the federal government is the "power to wage war successfully." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 426 (1934). The power to "provide for the common Defense" must be the power to provide in time of peace for the protection of the Nation. "In time of peace prepare for war" is not only good sense, it is also sound constitutional law.

Both the necessity for action and the kind of action to be taken must be determined by the Congress. I do not hesitate to say that if Congress enacts legislation along the lines of either of these two proposals, supported by appropriate declarations of policy and findings of fact, such legislation would in my opinion be well within the constitutional powers of the federal government.

TOM C. CLARK
*Attorney General*